Marie Panepinto, Plaintiff-Appellant, v. Morrison Hotel, Inc., a Corporation, Defendant-Appellee.

Gen. No. 49,448.

First District, Fourth Division.

April 22, 1966.

Rehearing denied June 8, 1966.

Westbrook, Jacobson and Brandvik, of Chicago (James A. Brandvik and Lowell H. Jacobson, of counsel), for appellant.

Menk & Johnson, of Chicago (John Cadwalader Menk, of counsel), for appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

The jury in this personal injury case returned a verdict for $100,000 in favor of plaintiff. Defendant's post-trial motion for judgment notwithstanding the verdict was denied. The court also denied defendant's motion for a new trial, but on the condition that plaintiff accept a remittitur of $65,000. When plaintiff refused to do this, a new trial was granted as to both liability and damages. We allowed plaintiff to file an appeal from that interlocutory order.

We shall first relate the facts as presented through the testimony of plaintiff and her witnesses.

On September 27, 1957, plaintiff and her husband were attending a Moose Lodge convention at the Morrison Hotel where they had engaged a private room. Plaintiff was 33 years old at that time and the mother of three children. At about 7:30 p. m. on the second day of her stay at the hotel plaintiff was entering her room when the transom over the door fell down and struck her on the back of the head, neck and shoulders. In the course of 45 minutes she changed to formal clothes, lay down for a while, and then went to a lower floor where the evening meeting was being held. In talking to some of the girls there she found she had a speech difficulty, so one of them called the house physician, a Dr. Collins. He arrived about 9:00 p. m., at which time plaintiff was participating in the ceremony on the stage. After some delay on this account, plaintiff and Dr. Collins went to plaintiff's room where he examined her for about 25 minutes. His findings were negative except that she was speaking in a very low voice and she had a small bump on the back of her head. He testified that "the bump was a contusion. You couldn't call it a concussion." He prescribed empirin and codeine for headache and suggested that X-rays be taken.

Plaintiff did not have X-rays taken but returned to the stage for the rest of the ceremony, after which she and her husband walked two blocks to the Sherman House where drinks and refreshments were served. At about 11:00 p. m. they started to return to the Morrison but plaintiff found that her legs were not functioning well, so they took a cab. Plaintiff is 5' 3" tall and "for quite a long time" had weighed in the upper 200s.

Reaching the Morrison at about 11:30 p. m. plaintiff went to their room with her husband's assistance. Dr. Collins was called again and he came to the room around midnight. He again advised X-rays and recommended that plaintiff go to the nearest hospital (Henrotin) for which he would make telephone arrangements. Plaintiff and her husband went to Henrotin Hospital where, after a considerable wait at the emergency room, plaintiff found no arrangements had been made for her. The nurse taking her case history commented that they "had a lot of these drunk cases." Plaintiff became so incensed at this remark that she left, because she had had nothing to drink. She and her husband arrived home in Franklin Park at 3:00 a. m. They called the Elmwood Park Medical Center in the expectation that there would be a doctor there at that hour. They talked to a Dr. Mansour. According to plaintiff, he visited her at her home the next morning, and on his advice she entered the Walther Memorial Hospital that day (September 28) and stayed for 14 days under Dr. Mansour's care. She then concluded that he was not doing anything for her but giving her tranquilizers which were not helping her condition (pain in the neck and shoulders; difficulty in speaking and in moving her legs), so she left the hospital and went home. Dr. Mansour sent a bill which was never paid.

Parenthetically, Dr. Mansour appeared as a witness for plaintiff. After refreshing his recollection by looking at the hospital records, he testified that he had seen

plaintiff for the first time on September 30, 1957 (not September 28); that she had then entered the hospital and stayed there under his care for eight days (not fourteen).

When plaintiff left Walther Memorial Hospital in October, 1957, on discharge by Dr. Mansour, she made arrangements to enter the Cook County Hospital, but she did not go there. Instead, her husband called the telephone company operator and asked to be referred to a "nerve doctor." He was given the name of Dr. Albert Olson, a chiropractor. As related by plaintiff, Dr. Olson gave her manipulation treatments daily for four months and "maybe three times a week" thereafter until August 7, 1960, when plaintiff "passed out" from a "heart attack" and Dr. Olson called in Dr. Frank Hoffman, also a chiropractor. Dr. Olson then "dropped out" and Dr. Hoffman took over the case. Dr. Olson is no longer practicing, his whereabouts are unknown to plaintiff, and he did not testify. Plaintiff never received a bill from Dr. Olson, but she figured she owed him $10 a visit.

Dr. Hoffman continued with daily chiropractic manipulation treatments for about two weeks, after which plaintiff felt better, and Dr. Hoffman was subsequently called only when she had pain. These visits occurred more than 130 times during the ensuing four months, often twice or three times in a single day. Dr. Hoffman's treatments, at $10 per visit, continued down to the time of trial, though specific information as to many of them was unavailable because some of his records had been destroyed by a fire in 1963. Plaintiff testified that Dr. Hoffman had been giving her tranquilizers and sleeping pills because of the pain. Dr. Hoffman said, however, that at no time had he prescribed any drugs for her—only vitamins and food supplements. He also testified that he had given her a bulk formula and special diets for overweight. Plaintiff denied that he had instructed her as to loss of weight.

324

Returning to plaintiff's own testimony, we find negligible evidence of her good health prior to the accident in question.[1] If damages are to be supported, her physical and emotional condition prior to the accident must, of course, be compared favorably to her postaccident condition. In more than 100 pages of plaintiff's testimony all we find on this score is: that for about four years prior to this accident she had been active with her husband in affairs of the River Grove Moose Lodge; that she had attended meetings weekly and ritual practice monthly; that she and her husband went out visiting; that she had done all the housework; that she had not had any pain in the neck, head or shoulders prior to September 28, 1957; that she had "felt good."

Alma Strain, reception chairman for the Women's Moose Convention in 1957, testified on behalf of plaintiff that she had seen plaintiff at the opening of the Moose rituals in the afternoon of September 28 and that "she was perfectly all right at that time." Mrs. Strain had seen plaintiff only once before in her life.

Conspicuous by its absence is any substantial evidence to support plaintiff's claim to good health prior to the occasion at the hotel. There was no testimony from any of the ladies who had been active with her in Moose affairs; nor from friends or neighbors in the community where she lived; nor from any of the many doctors who had cared for her prior to this accident, except Dr. Camero (a defense witness) whose testimony, set forth below, indicates that he found her condition in 1954 to be not greatly different from that existing at the time of the trial. Most significant, perhaps, is the lack of corroborative evidence concerning plaintiff's claimed ability to tend to all the household chores and care for her family prior to the accident. Her children (who were living with plaintiff in her home at the time of the trial), did not

---

[1] In her attorney's opening statement he had described her as an "active, normal, happy woman" before this accident.

testify in support of this claim. Nor did plaintiff call her husband to testify on this score, nor as an occurrence witness (which he was) despite his presence in court throughout the trial.[2] In fact, he was a coplaintiff in the suit until he was dismissed on his own motion during the presentation of plaintiff's case.

Plaintiff also testified that she had been in one other accident, involving an automobile, in about 1946 or 1947, and that she had then sustained no injury but merely a bump on the stomach. She said that on that occasion she had gone to the hospital, but only for a checkup, and had not stayed overnight. An Elmhurst Hospital record for September 1954, however, indicated that in giving her medical history at that time plaintiff had related a hospital stay of ten days as a result of an automobile accident six years before. This latter evidence was introduced by defendant through Dr. Ciriaco Camero, who had attended plaintiff in the Elmhurst Hospital in 1954, she having gone there because of itching which had developed in the course of weight-reducing treatments. Dr. Camero, who was not a dermatologist, testified that "at the hospital all the tests were taken that are normally taken and all the tests were negative." All symptoms were also negative except obesity (268 pounds). His diagnosis was "psycho-physiological nervous system reaction." He said that the "itchiness was caused by the nervous system rather than some organic disease," and that "you might say she had a case of nerves."

Plaintiff testified that when hospitalized in Cook County Hospital for childbirth in 1942, she had left the hospital against the advice of her physician (because, she said, her husband was not permitted to visit her there). When in the Mother Cabrini Hospital, again for childbirth, during Easter week of 1944, she again left against her

---

[2] Plaintiff's husband sat behind plaintiff in front of the jury and, after she testified, was massaging her neck during the trial until the court put a stop to it.

doctor's advice (because, she said, being a Catholic hospital, they had nothing to eat but fish and she couldn't stand the smell). In 1945 she left the Little Company of Mary Hospital against the advice of her doctor. The record also discloses, in the testimony of plaintiff's witness Dr. White, that when she was under his care at Loretto Hospital in 1960 she left the hospital before he wanted her to. Plaintiff denied this.

As to her postaccident condition, plaintiff testified that she was unable to speak above a whisper. She said that her voice "came back slowly at first," and that this difficulty continued until about nine months before trial. For some time after the accident plaintiff also experienced difficulty in moving her legs. Further, she testified that she suffered discomfort and pain in her shoulders, neck and head which continued to the time of trial. For this condition she was still taking tranquilizers, sleeping pills and pain pills. The relief afforded by the manipulations of her chiropractors had, she said, been only temporary and she was too nervous to leave the house; she had been out to a dance only once; her sons had gone away to military school for a while; her husband had done the housework; about all she had done was lie on the couch and watch television.

In August of 1960, when plaintiff had lost consciousness and Dr. Olson had brought Dr. Hoffman into the case, the family doctor, Dr. Gregory White, a licensed M.D. physician and surgeon, was also called in, though the record is not clear as to the date.[3] He caused her to be hospitalized in Loretto Hospital for X-rays and other tests. He did so because she was paler than usual and had suffered a weight loss of some 30 pounds. He was apprehensive that the cause of these conditions might be some serious organic disease. She was given an electro-

---

[3] Plaintiff testified that the chiropractor diagnosed her seizure as a heart attack, but that Dr. White told her she had had a heart palpitation.

327

cardiogram, X-rays of the chest, stomach and colon, Kahn test, blood count and urinalysis. It is significant to note that no X-rays were taken of her neck or spine, to the best of Dr. White's recollection, yet plaintiff testified that she had gone to the hospital at that time "in connection with being treated for the injury involved in this case."

Dr. White said that he had first seen plaintiff in late 1958 or early 1959. (From the whole record it seems more likely that it was in late 1960. In any event, it was more than a year after the accident in question.) Her complaints related to him were pain in the head and neck, loss of voice, shortness of breath, weakness and fatigue, "and she traced this back to an injury which had taken place some time previously." On examination he found her to be obese and mildly anemic. Other physical findings were negative so far as major pathology was concerned. "There was equivocal tenderness in the muscles of the neck and upper back." He prescribed medication for relief of pain and instructed her in the use of a neck traction apparatus which she had already been using for some time.

In the course of the next five years, to a time three weeks before the trial, Dr. White saw plaintiff about a dozen times. He testified that he gave her "a number of prescriptions for medication to relieve pain, to help her sleep. There were some tranquilizers prescribed and some medication for colds and minor infections, things of that sort."

In a report to plaintiff's attorney in April 1961, Dr. White described her objective symptoms as obesity, pallor and weight loss; subjectively, fatigue, weakness and shortness of breath. His diagnosis was (1) obesity, (2) hypochromic anemia due to iron deficiency or blood loss, and (3) neurasthenia. He testified that the lay term that would come close to neurasthenia would be "nervous exhaustion."

Dr. White further testified that when he examined plaintiff three weeks before trial (September 1963) he found pallor and mild obesity; otherwise "the results were essentially negative." Her subjective symptoms at that time were "headache and shortness of breath and considerable apprehensiveness."

█ Plaintiff sought by this witness to establish a causal connection between the accident in the hotel and the subjective symptoms about which plaintiff complained to Dr. White. Dr. White kept no records of his treatment of plaintiff,[4] and the only evidence of her prior medical history known to Dr. White was the statement quoted above to the effect that she attributed her complaints to an injury which had taken place some time previously. It does not appear from the record in this case that he knew anything about the nature of the injury, the hospital tests and X-rays which had been made, her subsequent treatment by the chiropractors, her physical and emotional condition during the periods before or after the accident in question, the opinions of the many doctors who had examined or treated plaintiff, her numerous hospitalizations, etc. In fact, it does not appear that the injury to which plaintiff "traced" her troubles was necessarily the one that she sustained in the accident at the hotel. For all that does appear, it could have been the injury she sustained in the automobile accident some years before that. It is difficult to imagine a weaker basis than this for the introduction of expert medical testimony for the jury's consideration on so important a point. This is especially true when it is recalled that Dr. White had been unable to make any objective findings in support of plaintiff's subjective complaints.

Dr. White was asked, nevertheless, for his opinion as to whether plaintiff's subjective complaints "might or

---

[4] Dr. White said that he usually kept record cards for his patients but that he had never made one up for plaintiff, even though he knew in 1961 that the case was in litigation.

could have been caused by this accident she told you about." Over objection he was permitted to reply, "Generally, I would say that her subjective complaints could have been related to her previous accident."

The objection which had been made was that there was a total lack of proper foundation for such testimony. After a fairly lengthy colloquy between court and counsel, the objection was overruled and the following is recorded:

> The Court: It is my understanding a medical Doctor is entitled to state his opinion based on might or could or would, whatever the words are.
>
> Mr. Menk [attorney for defendant]: Well, there is no foundation in the evidence at this point, is my point, your Honor.
>
> The Court: Well, assume there is for the sake of this case.

We consider that this ruling constituted serious error.

Dr. Chafick Mansour, a specialist in surgery, testified on behalf of plaintiff. He told about plaintiff's hospitalization in September, 1957 at Walther Memorial under his care (as set forth above). He noted her subjective symptoms (inability to raise her legs or speak above a whisper) and considered them "bizarre" in view of the fact that after standard neurological examination and tests he could detect no abnormality. Dr. Mansour testified further that where there is permanent paralysis, nerve disturbance or damage will be present; but that when neurological tests are negative, then subjective symptoms such as plaintiff's are due to emotional involvement or hysteria. For that reason Dr. Mansour did not examine plaintiff's larynx, as he considered her voice difficulty part of that pattern. His diagnosis was that plaintiff had received a concussion (contrary to the opinion of Dr. Collins), muscle spasm in the neck and shoulders from a blow on the head, and, in addition, plaintiff had a conversion type hysteria or emotional involve-

330

ment.[5] He therefore concluded that the case was out of his field, and instructed plaintiff that she should consult a doctor who was a neuropsychiatric specialist.

On cross-examination Dr. Mansour testified that trauma is a "possible" cause of conversion hysteria, but that there are "probably" other causes, the number or variety of which he could not state with certainty. When asked by the court to define the term, "conversion hysteria," the witness declined, saying that it was outside his specialty and that he could give only "sort of a hodge-podge of it." He then stated that this diagnosis was not his own, but that of the attending neurologist, a Dr. Zivin. (Dr. Zivin did not testify.) He said further, "I am not really qualified in my own field to make this diagnosis."

■ At this turn in the testimony of Dr. Mansour, defense counsel made a timely motion that the evidence concerning conversion hysteria be stricken. The motion should have been allowed, and it was error not to do so. In so saying, we are not unmindful of this court's opinion in Hickey v. Chicago Transit Authority, 52 Ill App2d 132, 139, 201 NE2d 742, but believe the circumstances to be distinguishable. Plaintiff argues that defendant may not urge this point on appeal because it was not specifically raised in defendant's post-trial motion, citing Ill Rev Stats 1963, c 110, § 68.1, and Lawler v. Pepper Const. Co., 33 Ill App2d 188, 195, 178 NE2d 678. This argument misses the mark because defendant is not the appellant here.

■■ Moreover, the inclusion of Dr. Mansour's diagnosis in plaintiff's case which went to the jury presents another important question from a different point of view. It must be remembered that medical evidence of this character is admissible only because the witness is qualified to render such an opinion by virtue of special knowledge and experience not shared by persons gen-

[5] This latter conclusion was not so very different from the diagnosis Dr. Camero had made three years before this accident.

erally. Consequently, when, as here, the expert candidly forswears expertise in the area of concern, his testimony must necessarily carry negligible probative value. In considering the weight of the evidence it may, for all intents and purposes, be ignored.

Plaintiff never saw Dr. Mansour again and did not follow his advice to consult a psychiatrist. It was then that she turned to chiropractic. Three or four years later Dr. Hoffman, the second chiropractor, also thought plaintiff was "emotionally disturbed" and had a Dr. Anderson, a psychiatrist, come to see her. As stated by Dr. Hoffman: "The symptoms that caused me to believe that there may be an emotional problem was not being able to relieve the pain, and also due to the fact that she kept getting the dizziness and discomfort and there had been some damage or something to the nerves that I did not know." Dr. Anderson made arrangements for plaintiff to go to the Hinsdale Sanitarium and Dr. Hoffman took her there. She was examined by a psychiatrist (not Dr. Anderson), but did not stay overnight. Dr. Hoffman testified that he asked that psychiatrist for a report but never received it, so he "just continued along with these manipulations." [6]

As mentioned above, Dr. Hoffman's treatments were started in August of 1960 and continued to the time of trial. ("My treatment hasn't varied since the first treatment.") During most of this time plaintiff was also seeing Dr. White. Dr. Hoffman knew of Dr. White's visits but there was minimal consultation between the two men.[7] Plaintiff's subjective complaints, as related by Dr. Hoffman, were headaches, inability to walk, difficul-

---

[6] Dr. Hoffman testified that plaintiff had paid him $222 and still owed $1,479.80.

[7] Dr. Hoffman testified: "Dr. White said he was giving her something for relief of pain and that's all he told me. I didn't talk to him about any other type of treatment. I got no report from him; I didn't ask for any."

ty in breathing, and inability to control her voice—"it would fade every now and then." He found a tightness or spastic condition in her neck and upper spine. This he sought to relieve by his treatments which were for the purpose of reducing "nerve pressure." He took X-rays of plaintiff at his office, but they were destroyed in a fire. Dr. Hoffman also testified that he delivered X-rays he had taken to Dr. White. He also gave her a bulk formula and diet for a weight-reducing program, and some general formula for improvement of a low blood count.

Dr. Hoffman testified to no diagnosis other than what is implicit in the recital above. He did, however, testify that plaintiff had told him she had been hit on the head by a transom board at a hotel and "that she had pain and discomfort and all ever since that time." He was asked whether the conditions he found in his examinations of plaintiff might or could have been caused by that accident. Over objection he was permitted to answer, and stated: "I would say in my opinion such an injury of this type could be caused by an accident as described to me." This testimony, strongly relied upon by plaintiff to establish causation between the injury at the hotel in 1957 and plaintiff's condition of ill-being in 1963, in fact, does nothing of the kind. Dr. Hoffman said that the injury could have been caused by the accident, and gave no testimony whatsoever that the injury thus sustained by accident was the cause of plaintiff's complaints five years later.

■ Further, as in the case of Dr. White's testimony, there was a distinct lack of essential foundation necessary to establish the qualification of the witness to give his opinion as to causation. Particularly, there was no showing that he knew anything about plaintiff's condition and medical history before the accident, or during the three-year period after the accident—absolute essentials to a proper opinion concerning the cause of her later condition (if he were to have given such an opinion,

333

which he actually did not). An appropriate and timely objection was made to this testimony and was erroneously overruled.[8]

This was the sum of the medical evidence presented on plaintiff's behalf. The record discloses that during the six-year period between the accident and the trial she had consulted at least nine or ten doctors of one kind or another (not including Dr. Tinsley who examined her at the behest of defendant) concerning the injury to her head and neck; that within the first hour after the accident plaintiff had been advised to have X-rays taken;[9] that X-rays were taken by at least three of the doctors (though Dr. White did not bother to take any of her head, neck or back). Yet no X-rays of any kind were produced at the trial, and only Dr. Hoffman gave an explanation as to what had happened to those which he took.

Plaintiff testified that she spent $2,438.41 for drugs, collectively, and approximately $850 for hospital bills, nursing care, Dr. Hoffman and X-rays. Dr. Hoffman said he was still owed $1,480. Dr. Mansour's bill for $225 remained unpaid. There was no testimony that either Dr. Olson or Dr. White ever sent a bill.

Dr. Collins was called on behalf of defendant and the substance of his testimony is set forth above.

Dr. Milton Tinsley, a neurosurgeon, examined plaintiff on behalf of defendant three months after the accident. He testified that plaintiff answered the door at her home, greeted him in a whisper, and walked to the bedroom for the examination. He said her primary complaint was an

---

[8] Objection was also made as to the form of the question (not hypothetical). We do not consider it necessary under the circumstances to deal with this point.

[9] Dr. Collins (house physician at the hotel) made that recommendation (including X-rays of the skull). He testified: "It is difficult in an examination like this to make a thorough determination without X-rays, and that is the purpose for which I wanted X-rays taken."

inability to speak above a whisper. She told him that the pain in her neck had been improved.

Dr. Tinsley found plaintiff's blood pressure to be 220/120 which he considered rather high. He then gave her a general neurological examination, including a battery of tests. In this regard he testified:

> All of these tests were performed in order to determine the function of the brain, spinal cord and peripheral nerves. The result of the tests was that I was unable to find any abnormality in the nerves of the brain or spinal cord or peripheral. I did not examine the larynx. . . . I did not examine the vocal cords, but if there is a paralysis of vocal cords, then there is either an arrestive speech, inability to speak at all or a hoarseness.
>
> One speaks in a hoarse voice. Whispering is not a function of the vocal cords or of the muscles of the pharynx but a function of the diaphragm, so to speak. As a matter of fact in my medical knowledge and from my medical knowledge I would say that whispering is a much more strenuous effort of the vocal cords than ordinary speaking. In other words, you are speaking but exercising this control over it to keep the volume down, and that control comes from the diaphragm and the lower portion of the throat musculature. If both vocal cords are paralyzed, you cannot speak.

And on cross-examination he said:

> Along with neurological difficulties a patient would develop a hoarseness, if there is nerve damage. In my opinion, she was whispering and did not have a hoarseness to the voice.

 We have set forth the evidence at so great length because the determinative issue presented here requires us to decide whether or not, on due consideration of the

facts in the case, the trial court clearly abused its discretion in ordering a new trial. Many cases have established the duties of the trial and reviewing courts in this regard and we will not restate all the principles involved. See Hulke v. International Mfg. Co., 14 Ill App2d 5, 46, 142 NE2d 717; Morella v. Melrose Park Cab Co., 65 Ill App2d 175, 181, 212 NE2d 106; and Thomas v. Chicago Transit Authority, 16 Ill App2d 470, 476, 148 NE2d 833. Because of our view of this record we need not decide the specific rule to be followed by a trial judge in granting a new trial—whether he should do so if, in his opinion, the verdict is not sustained by a preponderance of the evidence (which we consider the better rule), or whether he should do so only if the verdict is against the manifest weight of the evidence. See Read v. Cummings, 324 Ill App 607, 609, 610, 59 NE2d 325. We believe the evidence on the issue of damages was so weak in the instant case (in relation to the size of the verdict) that the granting of a new trial was called for under either guide.

 It is true, of course, that the discretion to be exercised is not unlimited, and is to be controlled by reason. Kahn v. James Burton Co., 5 Ill2d 614, 623, 126 NE 2d 836. When, as in the case at bar, however, the verdict could well have been influenced by incompetent evidence erroneously admitted, or by erroneous instructions; or is clearly unwarranted by the competent damages evidence; or indicates passion or prejudice; reasonable discretion imposes a duty upon the trial judge to grant a new trial. In this circumstance even a remittitur would not have cured such a verdict. Stephans v. Chicago Transit Authority, 28 Ill App2d 229, 232, 233, 171 NE2d 229.

We do not know what reasons prompted the trial judge to order a new trial in this case. The obvious and probable ones we have described in some detail. In addition, and perhaps just as likely a basis for the excessive-

ness of the verdict, was the erroneous instruction which the jury received on the law of damages. Plaintiff contends that we may not consider errors in instructions because neither plaintiff's abstract nor defendant's additional abstract includes the conference on instructions to indicate that defendant had made timely objection to the damages instructions. Therefore, plaintiff argues, any point concerning instructions has been waived, citing Vasic v. Chicago Transit Authority, 33 Ill App2d 11, 180 NE2d 347.

■■■■■ We do not consider ourselves so limited in reviewing the issues of this case. Defendant is not seeking reversal of a judgment on the ground of erroneous instructions. It is simply seeking affirmance of the new trial order, and for that purpose we are free to examine the record as we might see fit. Richman Chemical Co. v. Lowenthal, 16 Ill App2d 568, 571, 149 NE2d 351. (Incidentally, the record does show timely objections by defendant which were also specifically set forth in its post-trial motion.) Furthermore, from an entirely different viewpoint, we believe we may properly study the instructions to see if they contain any explanation for the inordinate size of the verdict. We think they do afford such explanation.

By plaintiff's given instruction No. 10 the jury was told about the elements of damage for which they might compensate plaintiff if they found defendant liable. Included among those elements were: the "aggravation of any pre-existing ailment or condition," the "pain and suffering experienced and reasonably certain to be experienced in the future as a result of the injury," and the "present cash value of the reasonable expenses of medical care, treatment and services reasonably certain to be received in the future."

Plaintiff's given instruction No. 11 told the jury that if they found plaintiff entitled to "damages arising in the future because of injuries or because of future medical

337

expenses, [they] must determine the amount of these damages which will arise in the future." And further: "If these damages are of a continuing nature, you may consider how long they will continue. If they are permanent in nature then in computing these damages you may consider how long the plaintiff is likely to live."

 The jury should not have been permitted to speculate on these matters since there was, as we have seen, no evidentiary basis for them in the record. Lauth v. Chicago Union Traction Co., 244 Ill 244, 251, 252, 91 NE 431; Meltzer v. Shklowsky, 321 Ill App 400, 403, 405, 53 NE2d 272; Gaydos v. Peterson, 300 Ill App2d 219, 226, 227, 20 NE2d 837.

 The answer of plaintiff that these instructions were taken verbatim from IPI (Nos. 30.01–30.06 and 34.-01) is no answer at all. The appropriateness of any IPI instruction must be determined by its proper relationship to the evidence in the case on trial. In IPI these instructions carry the caveat that a phrase describing a particular element of damages is to be used only "when the evidence justifies its use," or warn that "there must be evidence that such pain and suffering is reasonably certain to occur in the future," etc. It was error not to have heeded this warning. It is our belief that the giving of these instructions may well have been importantly responsible for the jury's excessive verdict, since they opened up for the jury's consideration a field in which they might estimate damages many times the amount of those proved by the evidence.

A major part of plaintiff's briefs in this court is devoted to arguing that many errors and improprieties during the trial inured to the benefit of defendant. For example, points are made that defense counsel in numerous ways brought improper matters to the attention of the jury during the hearing of evidence and in argument; that plaintiff's neurologist Dr. Israel Zivin and two of

plaintiff's children were erroneously prevented from testifying on the ground that their names had not been included in the answer to defendant's interrogatories; that Dr. Camero should not have been permitted to testify for defendant; and so on.

These assignments of error are all irrelevant, and we make no decision in regard to them, for plaintiff is not appealing from an adverse verdict. Quite the contrary. It is possible that the children and Dr. Zivin might have been able to furnish some of the badly needed evidence necessary to support the verdict, but on the present record, there having been no offer of proof as to what their testimony would have been, it serves no purpose to indulge in such speculation. Actions of the court and defendant's attorney, alleged to have been prejudicial to plaintiff's case, are equally irrelevant.

█ █ Plaintiff also contends that the court erred in not conducting a hearing on plaintiff's post-trial motion. This document, which related primarily to the issue of damages, was filed after entry of the order granting the new trial. The trial judge stated that he would permit the motion to be filed but that a hearing thereon was "not in accord with statutory intendments." We agree. As a matter of fact, we believe that the statute did not give plaintiff any right to file such a post-trial motion. Section 68.1(3), on which plaintiff relies, provides: "A party against whom judgment is entered pursuant to post-trial motion shall have like time (30 days) after the entry of the judgment within which to file a post-trial motion." Ill Rev Stats 1963, c 110, § 68.1(3). There was no basis for the filing of a post-trial motion by plaintiff in this case since there was no judgment entered against her.

█ █ We turn, then, to the issue of liability. The testimony presented on behalf of plaintiff, as it relates to this question, has been set forth in the early part

of this opinion. We believe that it established a prima facie case of liability.[10]

While defendant sought to point out inconsistencies in plaintiff's testimony as to the occurrence itself, we deem it essentially uncontroverted that the transom over the door to plaintiff's room became dislodged, somehow or other, and, in falling, struck plaintiff on the head. The testimony of defendant's witness Dr. Collins corroborated rather than controverted plaintiff's story, to the extent that he found a bump on plaintiff's head which she told him had been caused by the fall of the transom, and for which he prescribed medicine for the relief of headache. The two other medical witnesses presented by defendant testified on the issue of damages only.

Frank Hurley, Security Officer for the hotel, testified that he went to plaintiff's room upon call by his chief supervisor, and there he saw plaintiff and her husband. The transom was lying on the floor against the wall. They told him that the transom had fallen and struck plaintiff on the head. He asked them to let him call a doctor, but they refused. Hurley did not examine the transom or the door. Nor did he seek to determine the nature or extent of plaintiff's injury. He merely made out his report on the basis of what she told him.

Leslie Forsberg, Assistant Manager and Superintendent of Service of the hotel, was called by Hurley and proceeded to plaintiff's room. No one was there. He found the wooden transom leaning against the wall, and saw that "[i]t was empty above the door where the transom would be." Forsberg located plaintiff in the ballroom and called Dr. Collins, although plaintiff said she didn't want

---

[10] We note, in passing, that the trial court refused to instruct the jury on plaintiff's theory of res ipsa loquitur. We fail to see why that doctrine was not applicable to this case. See McCleod v. Nel-Co Corp., 350 Ill App 216, 112 NE2d 501; also, O'Rourke v. Marshall Field & Co., 307 Ill 197, 200, 138 NE 625; and Feldman v. Chicago Rys. Co., 289 Ill 25, 34–36, 124 NE 334.

to see a doctor. He did not examine the transom, its screws or bolts, "or anything like that," because it would have been the responsibility of Hurley to make such an investigation. The maintenance department took care of putting the transom back. Forsberg did not further concern himself with the incident.

We believe that this evidence wholly fails to counteract the proof of liability as established by plaintiff's testimony. Defendant argues further, however, in reliance upon Christian v. New York Cent. R. Co., 28 Ill App2d 57, 68, 107 NE2d 183 that comments by the judge throughout the trial and questions put by him to some of the witnesses were so prejudicial to defendant's cause as to create a climate inimical to a fair trial. We do not agree that the acts complained of were so serious a matter under all the circumstances of this case.

It is our conclusion that the trial court abused its discretion in granting a new trial on the issue of liability.

The order of the Circuit Court directing a new trial is reversed insofar as it relates to the issue of liability and affirmed insofar as it relates to the issue of damages, and the cause is remanded for a new trial on the question of damages only.

Affirmed in part, reversed in part, and remanded.

DRUCKER, P. J. and McCORMICK, J., concur.