MILTON BROWN, Plaintiff-Appellee, v. CHICAGO AND NORTH WEST-
ERN TRANSPORTATION COMPANY, Defendant-Appellant.

First District (2nd Division)   No. 86—2235

Opinion filed October 6, 1987.

Richard A. Haydu and Daniel J. Mohan, both of Chicago, for appellant.

Nicholas J. Motherway, of Motherway & Glenn, P.C., of Chicago, for appellee.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

Plaintiff-appellee Milton Brown brought suit against his employer, the Chicago and North Western Transportation Company (North Western), pursuant to the Federal Employers' Liability Act (FELA), 45 U.S.C. sec. 51 *et seq.* (1982), to recover damages for personal injuries he sustained while in the course of his employment. North Western admitted its liability; therefore, the only issue at trial was that of damages. The jury returned a verdict in favor of Brown in the amount of $175,000, itemizing his damages as follows: $107,000 for the value of past and future earnings lost, $50,000 for pain and suffering, and $18,000 for disability.

North Western appeals, and presents the following issues for review: (1) should the trial court have instructed the jury on Brown's duty to mitigate his damages; (2) did the trial court err by allowing the jury to award Brown damages for future lost earnings without reasonably certain proof that such damages would be sustained in the future; (3) did the trial judge abuse his discretion when he precluded North Western from impeaching Brown's credibility with a 1977 burglary conviction; (4) should the trial court have required expert economic testimony as a precondition to an award of damages for future earnings lost; and (5) were the damages awarded either excessive or inconsistent? We reverse the decision of the trial court and remand the case for a new trial.

A review of the record discloses that on February 15, 1985, Brown commenced the instant suit against North Western, alleging that on January 10, 1985, he was employed as a coach car cleaner and

was assigned to mop the first floor of a bi-level commuter car while another employee, David Williams, inspected the second level. According to Brown, Williams placed a claw hammer on a shelf which was nine feet above the floor where Brown was working, and as the men performed their respective tasks, the hammer somehow fell and struck Brown on the right side of his lower back. North Western denied the factual allegations asserted in Brown's complaint, and initially proffered the affirmative defense that Brown's conduct was the sole and proximate cause of his injury. Later, however, North Western stipulated that it was liable for the injury. The parties were unable to agree on a dollar figure as to damages, however, and trial ensued on that issue alone.

At trial, Brown testified that he tried to continue working after being struck by the hammer, but could not endure the pain emanating from his back. He reported the incident to his supervisor, who in turn referred him to Dr. Thomas Cook of North Western's medical department. After conducting a physical examination, Dr. Cook directed Brown to go home, rest, and return to work on Monday, four days later. Upon his return on the day indicated by the doctor, however, Brown still complained of pain; consequently, North Western sent him to the Northwestern Hospital Emergency Room, where he was treated for one hour and released with instructions to see Dr. Proctor Anderson.

Brown subsequently visited Dr. Anderson on January 18 and 25, and the doctor prescribed bed rest and muscle relaxants to relieve his pain. Dr. John Hefferon, an associate of Dr. Anderson's retained by North Western as an orthopedic consultant, also examined Brown on January 22. Dr. Hefferon is certified by the American Board of Orthopedic Surgery and is a teaching associate in that specialty at various Chicago area hospitals. He testified on behalf of North Western that when he examined the patient he did not detect any bruises, puffiness, or discoloration on Brown's lower back area. He then asked Brown to perform a variety of motion tests consisting of bending and stretching exercises, and the results indicated that Brown suffered a 50% loss of mobility. However, he claimed that Brown tested normal on reflex tests and other physical examinations which did not require Brown's cooperation for accurate results. On the basis of these observations, Dr. Hefferon diagnosed Brown as having a "lumbar contusion," or a bruise of the lower back, though he did not believe that the injury was a serious or chronic condition. Brown testified that Dr. Hefferon advised him on February 15 that he could return to work.

Instead of returning to work, Brown consulted Dr. Jamie Ben-

dersky, who admitted him to Westlake Community Hospital on February 19, 1985. During a seven-day stay at Westlake, Brown was subjected to a battery of tests designed to determine the source of his discomfort. The results of these tests, however, consistently indicated that there was nothing objectively wrong with him. Brown thereafter underwent physical therapy on an outpatient basis through April of 1985, at which time he reported some improvement in his condition. Frustrated at his inability to find the cause of Brown's pain, Dr. Bendersky referred Brown to Dr. Edward Gordon, head of the Rehabilitation Department at Westlake Hospital.

Dr. Gordon graduated from Harvard College and Tufts Medical School, has been certified in physical medicine and rehabilitation since 1962, and has published 57 articles in professional journals and other publications. On Brown's behalf, he testified that he performed a neurological and orthopedic examination on Brown on November 18, 1985, detected an "involuntary hyperesthetic reflex action," and concluded that Brown was suffering from "hyperesthesia," or an abnormal sensitivity of the senses. He also observed a "bulging mass" on Brown's back, and opined that it was scar tissue remaining from the contusion caused by Brown's being struck by a falling object. As therapy for the injury, Dr. Gordon prescribed injections of steroids and anesthetics, and Brown subsequently received four such injections on an outpatient basis over a six-week period.

In Dr. Gordon's expert opinion, Brown's injury precluded any employment which predominantly involved lifting, standing, or walking. He stated that during his entire practice, he had never seen a "soft-tissue" injury like Brown's and that he knew of little data available by which to predict the course of the injury. Accordingly, he concluded that Brown's physical limitations could be permanent in nature, but he also admitted that Brown might recover and be able to resume his old job, though he did not say or could not tell when.

In addition to Dr. Gordon, other experts testified on Brown's behalf. For example, Dr. Vassiliki Toulious, a psychiatrist, testified that beginning in July 1985, he treated Brown for severe depression which he believed was the result of a post-traumatic stress disorder exacerbated by his prolonged medical treatment and inability to work. Dr. Toulious encouraged Brown to pursue the employment and rehabilitation opportunities offered by North Western. Judith Sher, a vocational rehabilitation counselor employed in the Chicago firm of Rehabilitation Management, Inc., also testified that Brown retained her in March and April of 1986, approximately 15 months after the injury, for the purpose of evaluating Brown's employment prospects. Noting

that Brown earned approximately $27,000 annually before his injury, she believed that the salary of jobs which Brown could hold given his physical limitations ranged from $10,400 on the low side to $18,000 on the upper scale. Over North Western's objection, the jury was informed that according to an authenticated life-expectancy table Brown's life expectancy was 37.5 years as of the time of the trial, and that his working expectancy was 34 years.

North Western presented the testimony of Paul Swiecicki, a rehabilitation counselor employed by North Western who related that his job was to assist injured employees in returning to their previous jobs or to help them find new positions with North Western or with another employer. To this end, he interviewed Brown on June 25 and again on July 15, 1985. During the course of these discussions, Swiecicki suggested that Brown enroll in a program at the Rehabilitation Institute of Chicago. Various other options were also considered, including the possibility of Brown's either returning to his previous job or submitting to personnel testing to obtain other employment. Swiecicki informed Brown that North Western would pay for any medical, vocational, or educational expenses Brown might incur in learning new skills. He also asserted that Brown responded favorably to these proposals, and that an appointment was set for Brown at the Rehabilitation Institute. However, Brown failed to keep this date, and his counsel subsequently contacted Swiecicki and demanded that he have no further discussions with his client.

Prior to Swiecicki's giving this testimony, however, Brown testified on direct examination that the reason he did not pursue the rehabilitation offered by Swiecicki was that he did not trust North Western. When asked to explain his distrust, Brown answered as follows: "The reason is that in February while I was in the hospital and when I had acquired a lawyer, or an attorney, which is you, and you filed a suit, Chicago North Western answered that ***." Before he was allowed to testify any further, North Western promptly objected and, outside the presence of the jury, argued that Brown's testimony would indicate that North Western in its answer to Brown's complaint had initially denied liability for his injuries. Counsel for Brown, on the other hand, contended that the reason Brown did not trust North Western was necessary to refute North Western's probable argument that Brown failed to mitigate his damages. The court sustained the objection on the grounds of hearsay, thus prohibiting Brown from testifying as to why he did not trust North Western.

## I

■ We first consider whether the trial court should have instructed the jury regarding Brown's duty to mitigate his damages. The record shows that North Western entreated the trial judge to give to the jury the following instruction:

> "An injured party is under a legal objection to mitigate his damages, that is, to minimize the economic loss resulting from his injury, by resuming gainful employment as soon as such can reasonably be done.
>
> Failure of the injured party to make a reasonable effort to minimize damages does not prevent all recovery for economic loss, but it does preclude recovery for damages or losses which could have been avoided had a reasonable effort to lessen damages been made."

After brief argument, the trial judge refused this proposed mitigation instruction without stating his grounds for so ruling.

During the instruction conference, Brown argued that the requested mitigation instruction should be rejected because it was "not I.P.I. [Illinois Pattern Jury Instructions], it's not the law in Illinois." Brown also reasoned that "[t]here's no evidence in the case to justify giving [the instruction]." In addition to these two contentions, Brown raises three additional points in his brief to this court, namely, that it would be fundamentally unfair to require a mitigation instruction while simultaneously denying Brown the opportunity to explain why he did not cooperate with North Western's efforts to find him alternative employment; that the instruction should not have been given because there was no accompanying "burden of proof" instruction; and finally, in any event, the failure to give the instruction was harmless error.

Brown's argument that the mitigation instruction did not state the law in Illinois is palpably in error and therefore does not constitute a basis for denying the instruction. As noted earlier, Brown's cause of action was predicated upon a Federal statute, namely the FELA. The United States Supreme Court has stated that "[i]t has long been settled that questions concerning the measure of damages in an F.E.L.A. action are Federal in character. [Citation.] This is true even if the action is brought in state court. [Citation.]" (*Norfolk & Western Ry. Co. v. Liepelt* (1980), 444 U.S. 490, 493, 62 L. Ed. 2d 689, 693, 100 S. Ct. 755, 757.) Moreover, our supreme court, even before *Liepelt*, held that United States Supreme Court cases must be followed in construing Federal rights under the FELA. (*Bowman v. Illinois Central R.R. Co.* (1957), 11 Ill. 2d 186, 226, 142 N.E.2d 104.)

Thus, it is clear that Federal law governs the determination of the issues herein. Indeed, during the instruction conference, North Western advised the trial judge that Federal law controls in actions brought under the FELA, that Federal cases have held that an employee has the duty to mitigate damages by returning to gainful employment as soon as reasonably possible, and that therefore the requested instruction was proper. *Taylor v. Denver & Rio Grande Western R.R. Co.* (10th Cir. 1971), 438 F.2d 351, 354; *Young v. American Export Isbrandtsen Lines, Inc.* (S.D.N.Y. 1968), 291 F. Supp. 447, 450; *Holladay v. Chicago, Burlington & Quincy R.R. Co.* (S.D. Iowa 1966), 255 F. Supp. 879, 886-87; *Alexander v. Meiji Kaium K.K.* (E.D. La. 1961), 195 F. Supp. 831, 835, *aff'd* (5th Cir. 1962), 311 F.2d 385; see also *Narusiewicz v. Burlington Northern R.R. Co.* (Minn. App. 1986), 391 N.W.2d 895, 899.

As previously noted, Brown also objected to the instruction on the ground that "[t]here's no evidence in the case to justify giving it." It is abundantly clear in FELA cases that "[a] party is entitled to an instruction based on his theory of the case if there is record evidence to support it." (*Trejo v. Denver & Rio Grande Western R.R. Co.* (10th Cir. 1977), 568 F.2d 181, 184.) Accordingly, we must determine whether record evidence supported North Western's allegation that Brown failed to mitigate his damages.

To support his contention that there was no evidence presented to support this theory, Brown asserts that North Western failed to illustrate how his damages could have been ameliorated if he had cooperated with North Western's programs, nor did it produce any evidence of available employment that Brown had the physical ability to perform. Brown further avers that the fact that he sought out his own rehabilitation counselor, Judith Sher, in the spring of 1986 negates any suggestion that he failed to mitigate.

However, the law is clear that "[t]he question whether the conduct of plaintiff was reasonable effort in the circumstances was a question of fact for the jury under proper instructions. The refusal to give the requested instruction was error." (*Trejo v. Denver & Rio Grande Western R.R. Co.* (10th Cir. 1977), 568 F.2d 181, 184.) We believe that Swiecicki's testimony raised a factual question concerning Brown's alleged failure to mitigate from which a jury might reasonably conclude that Brown was indifferent to finding alternative employment in the following respects: (1) he refused to cooperate with North Western's efforts to place him in another position within the company; (2) he spurned North Western's plans to provide him with free rehabilitation and counseling services; and (3) he shunned North Western's

offers to fund vocational or scholastic training calculated to assist him in obtaining alternative employment. Though there was no evidence presented of other jobs available to him, North Western obviously was never given the opportunity to determine if it could place Brown in another position or educate or retrain him for new duties or responsibilities.

The above-cited case of *Trejo v. Denver & Rio Grande Western R.R. Co.* is helpful in our seeking to determine if there was indeed enough evidence presented at trial herein to justify the giving of a mitigation instruction. In *Trejo*, a railroad employee suffered a back injury which required two operations and rendered him 40% and 60% disabled. He could no longer continue in his job as a section laborer, and was forced to seek light work with the railroad and his union, but unfortunately no such positions were available. The injured employee subsequently sued the company under the FELA, and was awarded a verdict in the amount of $140,000. The company appealed.

In reversing and remanding for a new trial on the issue of damages only, the court found two errors regarding the instructions given by the trial court. First, the court held that since the plaintiff did not present any evidence of special damages and admitted that the company had paid his medical expenses, the trial court erred in instructing the jury that a damages award for the plaintiff should include the actual costs he incurred for medical and hospital treatment. The court then considered the effect of the trial court's refusal to give an instruction on mitigation of damages:

> "The [trial] court refused to give the Company's requested instruction that plaintiff was required to mitigate his damages by exercising reasonable efforts to find other employment. Normally, in a F.E.L.A. action a plaintiff is entitled to recover the difference between what he was able to earn before injury and what he earned or could have earned thereafter. [Citations.]
>
> Plaintiff argues that because of his age, language difficulties, education, and physical condition, he was unemployable as a matter of law. The record shows that his only efforts to secure employment were to ask the Company if light work was available for him and to ask his union for light work. The Company's refusal of light work did not estop it from raising the question of mitigation." (*Trejo v. Denver & Rio Grande Western R.R. Co.* (10th Cir. 1977), 568 F.2d 181, 184.)

North Western points out that there is clearer evidence of Brown's failure to mitigate than there is in the case of the *Trejo* plaintiff. For example, the plaintiff in *Trejo* at least sought to perform light work

for the company, whereas the record in the case at bar indicates that Brown did not seek any work with North Western or any other employer.

The case of *Narusiewicz v. Burlington Northern R.R. Co.* cited above is also useful in determining whether the mitigation instruction herein should have been given to the jury. In *Narusiewicz*, the court rejected the appellant's argument that the trial judge erred in giving a similar mitigation instruction:

> "Appellant testified that a Burlington Northern rehabilitation worker told him the railroad had no work for him. The railroad did not directly rebut this testimony, but the shop superintendent testified appellant could work as a laborer with the physical restrictions resulting from the injury. The railroad, moreover, was not the only employment possibility appellant might be required to explore. Appellant was out of work for approximately a year and a half. There was sufficient evidence of his vocational indecision during this period to justify the instruction given." (*Narusiewicz v. Burlington Northern R.R. Co.* (Minn. App. 1986), 391 N.W.2d 895, 899.)

Like the appellant in *Narusiewicz*, Brown was also out of work for an extended period of time before he sought rehabilitation through Judith Sher. It further appears that Swiecicki tried to be considerably more helpful to Brown than the rehabilitation counselor was to Narusiewicz. We hold, therefore, that there was sufficient evidence to justify the mitigation instruction.

■ We turn now to Brown's argument that it would be unfair to instruct the jury on his duty to mitigate his damages while denying him the opportunity to explain why he failed to follow Swiecicki's advice. As mentioned earlier, the trial court did not allow Brown to testify as to why he did not trust North Western. Apparently, Brown's diffidence stems from the fact that North Western initially denied liability for his injury. Brown argues that evidence of his skepticism should have been admissible if any alleged failure to mitigate was to result in the giving of a jury instruction. According to Brown, North Western's strategy was to plant the suggestion that Brown declined offers which would have decreased his damages, while denying Brown the chance to expound upon why such offers were rejected. According to Brown, North Western should not be able to "have it both ways."

We do not agree, however, that North Western is seeking to "have it both ways," nor do we believe that Brown's sensitivity to the defendant's pleading justifies the trial court's refusing the mitigation instruction. For example, in *Narusiewicz*, unlike the case at bar, the

question of liability was contested at trial, but the court nevertheless considered the plaintiff's lack of cooperation with the defendant as evidence of a failure to mitigate. (391 N.W.2d 895, 899.) Thus, we decline to hold, as Brown urges us to do, that simply because North Western denied liability in its initial pleading, an issue which was totally removed by the defendant from the trial, Brown had no duty to mitigate.

Brown next contends that the mitigation instruction was properly rejected because there was not an accompanying "burden of proof" instruction. The law is clear, as Brown points out, that the burden of proving the failure to mitigate damages is on the defendant, in this case North Western. (*Rozny v. Marnul* (1969), 43 Ill. 2d 54, 73, 250 N.E.2d 656.) However, Brown's argument fails to consider that the court's rejection of the mitigation instruction eliminated the need for either party to tender a related burden of proof instruction. Since this issue is likely to be reasserted on remand, we would expect that the mitigation instruction would be structured so as to inform the jury of the defendant's burden, or that there would be a companion instruction to that effect.

Brown finally asserts in the alternative that the trial court's failure to give the mitigation instruction should be deemed harmless error. In support of this argument, Brown points out that the jury awarded only $107,000 for lost future income, whereas he prayed for $374,000 for this item of damage, and that therefore the jury's calculation of future lost earnings reflects that it must have taken into consideration Brown's duty to mitigate his damages. Brown also emphasizes that since the jury heard the testimony of Swiecicki, as well as North Western's closing arguments discussing at length Brown's failure to cooperate with Swiecicki, it was not deprived of the opportunity to consider mitigation.

In contrast, North Western asserts that the *Trejo* case is authority for the proposition that a trial court's failure to instruct on mitigation constitutes reversible error. However, though the *Trejo* court did indeed find that such failure was error, nowhere did it explicitly hold that it was reversible *per se*. In fact, the court of appeals seemed far more concerned with the trial court's giving of a special damages instruction, which it held to be unwarranted. It is unclear whether a remand would have been necessary in that case if the only error had been the failure to give the mitigation instruction, or whether the decision to remand was as a result of the confluence of the two instruction errors.

Nevertheless, Brown does not cite, nor is there to be found, any

case standing for the proposition that the failure to give a mitigation instruction can be harmless error if the evidence in the record supports such a theory. Despite the fact that the jury heard mitigation testimony, we are unpersuaded by the harmless error argument inasmuch as the only question presented to them concerned the measure of damages. Unlike *Trejo*, in which the jury decided the issues of both damages and liability, here the mitigation instruction could have had a significant impact on the jury's deliberations. We hold, therefore, that fairness to North Western required that the trial judge give to the jury the requested mitigation instruction, and that failure to do so constituted reversible error. Accordingly, we remand this case for a new trial on this ground.

## II

■ We also believe that it was reversible error for the trial court to allow the jury to award Brown damages for future lost earnings without the presentation of reasonably certain proof that such damages would endure. Our supreme court has stated:

"A mere possibility, or even a reasonable probability, that future pain or suffering may be caused by an injury, or that some disability may result therefrom, is not sufficient to warrant an assessment of damages. It would be plainly unjust to require a defendant to pay damages for results that may or may not ensue and that are merely problematical. To justify a recovery for future damages the law requires proof of a reasonable certainty that they will be endured in the future." (*Amann v. Chicago Consolidated Traction Co.* (1909), 243 Ill. 263, 267, 90 N.E. 673.)

Furthermore,

"[a] [m]ere surmise or conjecture cannot be regarded as proof of an existing fact or of a future condition that will result. Expert witnesses can only testify or give their opinion as to future consequences that are shown to be reasonably certain to follow." (*Stevens v. Illinois Central R.R. Co.* (1922), 306 Ill. 370, 377, 137 N.E. 859.)

In defining "reasonable certainty," this court has added:

"When a doctor is asked to base his opinion on a reasonable degree of medical certainty, the certainty referred to is not that some condition in the future is certain to exist or not exist; rather the reasonable certainty refers to the general consensus of recognized medical thought and opinion concerning the probabilities of conditions in the future based on present condition."

(*Redmon v. Sooter* (1971), 1 Ill. App. 3d 406, 412, 274 N.E.2d 200.)

One authority has defined the standard as follows:

"Awards for such future losses in earning capacity will not be granted where to do so would result in speculation or conjecture. Recovery for impairment of earning capacity must in all cases be limited to the kind of impairment that is reasonably certain to occur because of the tort." M. Polelle & B. Ottley, Illinois Tort Law 711 (1985).

In addition, there must be an evidentiary basis in order for a court to give a jury instruction on future disability and lost wages. (*Panepinto v. Morrison Hotel, Inc.* (1966), 71 Ill. App. 2d 319, 338, 218 N.E.2d 880.) We have not hesitated to find that future damages are not recoverable when there has not been reasonably certain proof thereof. (*Harp v. Illinois Central Gulf R.R. Co.* (1977), 55 Ill. App. 3d 822, 827, 370 N.E.2d 826.) Accordingly, the issue is whether Brown presented reasonably certain proof establishing future damages.

Concerning the probable duration of Brown's injury, his expert, Dr. Gordon, testified as follows:

"[North Western's Counsel]: Doctor, you testified that the nature of Mr. Brown's injuries at this point could or might prevent him from ever going back to his old job, correct?

[Dr. Gordon]: Yes.

[North Western's Counsel]: On the other side of the coin, could or might Mr. Brown get better and be able to resume his old job?

[Dr. Gordon]: Yes, yes.

[North Western's Counsel]: Do you have any estimates what time frame this would occur in any event?

[Dr. Gordon]: All I can say is I really don't have any measures that could give me any decision in terms of this kind of prognosis. I really couldn't say."

North Western's expert witness, Dr. Hefferon, also testified that he did not believe that Brown suffered from a debilitating injury, but he did agree that hypothetically a lumbar contusion can be a chronic condition.

Focusing on Dr. Gordon's testimony, North Western asserts that the evidence presented does not satisfy the "reasonable certainty" standard enunciated above. We agree. While it is true, as Brown points out, that expert testimony couched in terms of probabilities or possibilities based on assumed facts is admissible (*Buford v. Chicago Housing Authority* (1985), 131 Ill. App. 3d 235, 245, 476 N.E.2d 427),

this rule does not lessen the need for a reasonable degree of certainty. It is manifestly unfair to hold North Western liable for injuries which Brown's own experts admit are problematical. For example, in *Terracina v. Castelli* (1979), 80 Ill. App. 3d 475, 480, 400 N.E.2d 27, the plaintiff argued that the court erred in striking his doctor's testimony that future surgery for the plaintiff was possible. We disagreed, holding that the doctor's response, "It's possible," to a question concerning the necessity of surgery in the future was too speculative to support an award for future medical expenses. Similarly, Dr. Gordon gave no indication as to the duration of Brown's injury. Therefore, we hold that judgment in favor of Brown was improper as to future lost earnings.

We hold that this error, too, does not require outright reversal, but instead can be cured by remanding the case for a new trial. For example, in *Bartimus v. Paxton Community Hospital* (1983), 120 Ill. App. 3d 1060, 1070, 458 N.E.2d 1072, this court found that the plaintiff's expert, a physician, was unable to say, with a reasonable degree of medical certainty, that plaintiff would experience any future medical problems as a result of the rupture of her appendix, and we accordingly reversed and remanded for a new trial.

We will now address the other questions raised by North Western in order to give guidance as to certain matters which may arise on remand.

## III

■ North Western next contends that the trial judge erred in precluding it from impeaching Brown's credibility through the medium of a 1977 burglary conviction. The record indicates that when Brown was deposed before trial, North Western asked him if he had a criminal record, to which he responded that he was convicted of theft sometime in 1973 or 1974. North Western apparently did not verify the truth of the statement thereafter, but claims instead that its suspicions were aroused when Brown's counsel at the onset of trial made a motion *in limine* to bar all evidence of his convictions, a motion which the court granted. According to North Western, it was only then that its counsel researched the criminal records, found the 1977 conviction, and attempted to introduce it into evidence. North Western asserts that Brown's misrepresentations under oath concerning the date of the conviction and the offense on which it was based acted to prevent it from gaining earlier knowledge of his criminal past. It further argues that it should have been allowed to use the conviction, as well as the "false statement" of Brown during his deposition, as

impeaching evidence at trial.

In *People v. Montgomery* (1971), 47 Ill. 2d 510, 516, 268 N.E.2d 895, our supreme court addressed an issue concerning the propriety of the use of a prior conviction for impeaching purposes, and adopted proposed Federal Rule of Evidence 609, which states as follows:

> "(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime, except on a plea of *nolo contendere,* is admissible but only if the crime, (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, or (2) involved dishonesty or false statement regardless of the punishment unless (3) in either case, the judge determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice.
>
> (b) Time Limit. Evidence of a conviction under this rule is not admissible if a period of more than 10 years has elapsed since the date of conviction or of the release of the witness from confinement, whichever is the later date."

The burglary conviction was for a crime punishable by imprisonment in excess of one year. (Ill. Rev. Stat. 1977, ch. 38, pars. 19—1, 1005—8—1(b)(3)), and, considering the fact that the trial was in May 1986, and that Brown was convicted pursuant to a guilty plea on January 18, 1977, it was also within the time limits of section (b). The issue, therefore, is whether the probative value of the conviction was "substantially outweighed by the danger of unfair prejudice."

The court's decision prohibiting North Western from impeaching Brown on collateral matters such as the conviction and the alleged false deposition statement must be reviewed under an abuse of discretion standard:

> "The admission of evidence to impeach the credibility of a witness on a collateral issue is within the discretion of the trial court. *** A reviewing court will not disturb the decision of the trial court unless there is an abuse of discretion." (*People v. Williams* (1985), 131 Ill. App. 3d 597, 609, 475 N.E.2d 1082.)

North Western fails to cite any case, and none can be found, in which a verdict has been reversed because of judicial abuse of discretion in this regard. We do not believe that the circumstances herein justify disturbing this well-established rule according the trial judge such deference.

## IV

North Western next argues that the trial court erred in refus-

ing to require expert economic testimony as a prerequisite to the award of future lost earnings. As noted earlier, in arguing to the jury that his future lost wages would equal $374,000, Brown did not present any expert economic testimony concerning the impact inflation may have on future wages or what rate of discount should be used in calculating the present cash value of any award rendered. The only relevant testimony was that of Judith Sher, who claimed that the best salary Brown could expect to receive in another job was approximately $18,000 annually. Brown based his request for lost future income on the approximate $11,000 difference between what he was making and the maximum amount Sher claimed he was capable of earning in his 34 years of work expectancy, arriving at a figure of $374,000. In his summation, Brown's counsel simply requested that the jury discount the $374,000 figure to somewhere around $300,000 in present cash value without detailing what discount factor was to be used in reaching such a determination.

The law is clear that "in all cases where it is reasonable to suppose that interest may safely be earned upon the amount that is awarded, the ascertained future benefits ought to be discounted in the making up of the award." (*Chesapeake & Ohio Ry. Co. v. Kelly* (1916), 241 U.S. 485, 490, 60 L. Ed. 1117, 1122, 36 S. Ct. 630, 632.) The Supreme Court has mandated a two-step process for determining present cash value:

> "The first stage of the calculation requires an estimate of the shape of the lost stream of future income. * * * The second stage of the calculation requires the selection of an appropriate discount rate." (*Jones & Laughlin Steel Corp. v. Pfeifer* (1983), 462 U.S. 523, 539, 76 L. Ed. 2d 768, 778, 103 S. Ct. 2541, 2551-52.)

Though the Supreme Court goes on to say that the trier of fact must make a "deliberate choice" of a discount factor, nowhere does the court mandate expert economic testimony for the jury to determine present cash value in FELA cases.

The only case North Western cites which allegedly supports the proposition that such economic testimony is a precondition to the jury's determining present cash value in an FELA case is the Third Circuit case of *DiSabatino v. National Railroad Passenger Corp.* (3d Cir. 1984), 724 F.2d 394. *DiSabatino*, however, stands only for the indisputable proposition that the failure to give an instruction on reduction of future lost earnings to present worth was reversible error. A clearer enunciation of the law governing this issue is found in *Lawson v. Belt Ry. Co.* (1975), 34 Ill. App. 3d 7, 28-29, an FELA case brought

in Illinois, where the court stated:

> "Defendant *** argues that the jury was misled in determining damages by the absence of actuarial evidence to illustrate how the present cash value requirement should be applied to plaintiff's future lost earnings. We disagree and further decline defendant's invitation to adopt the holding in *Ballantine v. Central Railroad* (3d Cir. 1972), 460 F.2d 540, that it is error to charge a jury with regard to future damages without present worth tables or other actuarial evidence being presented to guide their determination of the present cash value of such future damages. Plaintiff's Instruction No. 23 (IPI 34.04) sufficiently informed the jury that money damages for plaintiff's future loss must be reduced to present cash value. In Illinois, there is no requirement that actuarial evidence must be presented to guide the jury in how that determination is to be made."

In a subsequent FELA case in this State, this court again refused to require that actuarial or statistical evidence was necessary before the jury could award damages for future lost earnings. (*Crabtree v. St. Louis-San Francisco Ry. Co.* (1980), 89 Ill. App. 3d 35, 39-40, 411 N.E.2d 19.) Accordingly, the trial court in the instant case did not err when it allowed the jury to assess damages for future lost earnings.

## V

Finally, North Western contends that the damages awarded by the jury were either excessive or inconsistent. However, because the cause is being remanded for a new trial on the issue of damages, it is unnecessary to discuss this alleged error. See *F. E. Holmes & Son Construction Co. v. Gualdoni Electric Service, Inc.* (1982), 105 Ill. App. 3d 1135, 1142, 435 N.E.2d 724.

For the foregoing reasons, we reverse the decision of the trial court, and remand the case for a new trial.

Reversed and remanded.

STAMOS and HARTMAN, JJ., concur.