TRACY TEMPLETON, Plaintiff-Appellee, v. CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, Defendant-Appellant.

First District (5th Division)   No. 1—90—0312

Opinion filed November 19, 1993.

George H. Brant and Myles L. Tobin, both of Chicago and North Western Transportation Company, and Cornelius P. Callahan and Mark E. Christensen, both of Butler, Callahan & Ehret, both of Chicago, for appellant.

Demos & Burke, of Chicago (William J. Burke, James Thomas Demos, and Linda A. Leonetti, of counsel), for appellee.

JUSTICE MURRAY delivered the opinion of the court:

The plaintiff, Tracy Templeton (Templeton), was an employee of the defendant railroad, Chicago and North Western Transportation Company (CNW). On January 27, 1984, Templeton was performing track work on a bridge located in Pekin, Illinois, and was severely injured when he fell through an opening in the bridge deck and landed on ice 31 feet below the bridge. Plaintiff filed suit in the circuit court of Cook County pursuant to the Federal Employers' Liability Act (FELA) (45 U.S.C. § 51 *et seq.* (1988)), to recover damages for the injuries he sustained as a result of the fall. A jury awarded plaintiff damages in the amount of $3.5 million after a reduction of 14% for plaintiff's contributory negligence.[1]

Defendant appealed contending, *inter alia*, that the trial court improperly admitted into evidence "fall-protection" regulations issued by the Federal Occupational Safety and Health Administration (OSHA) and instructed the jury on the same. In an earlier decision, we reversed the decision of the trial court solely on that issue. (See *Templeton v. Chicago & North Western Transportation Co.* (1991), 211 Ill. App. 3d 489, 570 N.E.2d 467.) However, the Illinois Supreme Court subsequently reversed the judgment of this court, affirming the decision of the trial court on the OSHA issue, and remanded the matter to this court for consideration of the remaining issues originally raised by defendant's appeal. See *Templeton v. Chicago & North Western Transportation Co.* (1992), 151 Ill. 2d 325, 603 N.E.2d 441.

The following issues are presently before this court: (1) whether the trial court erred in permitting plaintiff to introduce evidence of previous employee accidents on other CNW bridges; (2) whether the trial court erred in failing to order a new trial after it was established that the jury had surreptitiously referred to an economics textbook during their deliberations on damages; (3) whether the jury's finding that the plaintiff did not fail to mitigate his damages is contrary to the manifest weight of the evidence; and (4) whether the damage award was excessive.

For the following reasons, we affirm the decision of the trial court.

## I

The trial court denied CNW's motion *in limine* directed at

---

[1]A slightly more detailed version of the underlying facts can be found in *Templeton v. Chicago & North Western Transportation Co.* (1991), 211 Ill. App. 3d 489, 570 N.E.2d 467.

precluding plaintiff from introducing evidence of other employee falls from other railroad bridges across CNW's multi-State rail system. As a result, plaintiff was allowed to introduce evidence that four other falls had occurred on CNW bridges between 1978 and 1982. In its post-trial motion, defendant alleged that CNW should be granted a new trial because the court erred in denying CNW's motion *in limine*. Defendant argued that in the present case the plaintiff offered no evidence to demonstrate a similarity between other accidents and that involving the plaintiff, and under such circumstances, the prejudicial effect of such evidence far outweighed whatever probative value it otherwise might have had, while also adding an inflammatory element to the proceedings which could only have served to improperly arouse the passions of the jury and contribute to an excessive verdict. Plaintiff maintains that the evidence of prior falls was properly admitted for the limited purpose of establishing CNW's notice of the problem it was facing with regard to bridge falls.

In ruling on the defendant's pretrial motion, the trial court allowed the admission of the "four situations of people falling from bridges" solely on the issue of notice and specifically noted that it would not allow the four accidents to be used in a "punitive damage situation." Plaintiff's counsel was instructed that the court would not allow him to tell the jury the nature of the injuries suffered in the prior falls as that information was not relevant to the issue of the defendant's notice.

Defendant maintains no evidence was presented that any of these other four accidents involved a fall through an opening in the bridge deck, much less a small temporary opening customarily present throughout a redecking project as in the case at bar. Defendant argues that by failing to require plaintiff to offer evidence demonstrating substantial similarities between the prior accidents and plaintiff's fall, the court thereby allowed plaintiff to invite the jury to find against the railroad based on totally irrelevant evidence of unrelated falls. Plaintiff argues that the similarities defendant claims should have been established before other falls were admitted in evidence are not relevant to the issue of whether the defendant had notice of the problem.

The following is the testimony relevant to the prior falls. Mr. Jerome Iwinski testified that he recently retired from a position as the assistant chief engineer of structures at CNW. In that position he had occasion to promulgate safety rules. When he took over the position, the railroad had an engineering policy dealing with bridge safety. He was apprised by his subordinates as to the chronology of events preceding the adoption of rule E-51. He identified a memoran-

dum (Hahn memo) prepared by "Mr. H.D. Hahn, the bridge engineer, giving a chronological listing of activities and letters subsequent to the accident at Bridge 351, Ottawa, Minnesota, in January of 1981." The Hahn memo indicated that in 1981 a B&B carpenter fell off a bridge in Ottawa, Minnesota, and as a result of said accident the railroad was cited by OSHA. The Hahn memo referred to the OSHA citation and the fact that on "February 12th, 1981, General Attorney Ann Valle advised the accident and loss prevention that we were cited by OSHA." At the time Mr. Iwinski reviewed all the material the memo referred to, including the letter from Ann Valle. Over defendant's objection, the letter was admitted into evidence. Mr. Iwinski read the first paragraph of the legal department letter:

"On January 22, 1981, Chicago and North Western Transportation Company was cited by OSHA for not providing safety equipment, that is lifeline, nets, or having adequate railing on bridge No. 351 at mile post 69.64 near Ottawa, Minnesota. This citation was triggered by an employee who fell off this bridge on January 8th, 1981. The transportation company has also been cited recently for not providing safety equipment or railings on a bridge near Boone, Iowa."

Plaintiff's counsel clarified that the aforementioned paragraph referred to not one but two OSHA citations regarding CNW's safety equipment on bridges.

After safety rule E-51 was adopted Mr. Iwinski was asked to do more work in the area of bridge safety. He wrote a memo in response to a request to study what additional steps could be taken to reduce the potential for disabling personal accidents. After reviewing other railroad policies, his conclusion was that the best defense against falls is to constantly remind the men to use extreme caution and vigilance. Mr. Iwinski testified that at the time he wrote said memo, he was not aware that, in the previous four years, there had been four falls by CNW employees off of bridges. However, he subsequently stated that he had received a copy of a memo from Mr. Jones which indicated that on four occasions in the past four years, CNW employees fell off of bridges.

On cross-examination, defense counsel asked "what that person was doing before he or she fell from E-50—or from the bridge in Ottawa, Minnesota." Mr. Iwinski replied that he believed the person was pulling what they call a line spike with a claw bar, and the spike broke. Mr. Iwinski testified that this did not bear any relation to his understanding of what Templeton was doing at the time of the occurrence as it involved a different procedure. Mr. Iwinski further stated that the bridge in Ottawa, Minnesota, did not have a walkway

as the bridge in South Pekin, Illinois, did. On redirect Mr. Iwinski testified that in the Ottawa, Minnesota, accident, the person fell because of a failure of a particular hardware item (the spike broke), and the person was not braced for the resulting accident, whereas in Templeton's case, it was a matter of pulling the hose; nothing broke.

Mr. Jones testified he worked for CNW. He acknowledged receipt of a letter from Ann Valle which referred to a man falling from a bridge and CNW being cited by OSHA as a result of that accident. The letter also talked about a citation on the Boone, Iowa, bridge and requested the recipients of the letter to investigate the matter to determine if there was any effective equipment available for bridge work. As a result of that accident and the letter, Mr. Jones reviewed and assessed the procedures that were in effect at the time. He served on a committee which looked at the existing rules and procedures to determine if there were any deficiencies. As a result of this analysis, the committee came up with E-51. In December of 1982 he was asked by his boss to look into the existing bridge policies. As a result of this request, he wrote a memo which included the information that there had been four falls from bridges in the past four years.

The determination of whether evidence is relevant largely rests within the discretion of the trial court, and a reviewing court will not disturb the trial court's ruling unless there has been an abuse of discretion. (*First National Bank v. Illinois Central Gulf R.R. Co.* (1978), 62 Ill. App. 3d 36, 378 N.E.2d 1329.) "Evidence of prior accidents is only admissible if it is relevant to the proponent's case." (*Henderson v. Illinois Central Gulf R.R. Co.* (1983), 114 Ill. App. 3d 754, 758, 449 N.E.2d 942, 945.) Evidence that is relevant has a legitimate tendency to prove or disprove a given proposition that is material as shown by the pleadings. *Belshaw v. Hillsboro Hotel, Inc.* (1992), 229 Ill. App. 3d 480, 485, 593 N.E.2d 170.

The general rule regarding the admissibility of prior accidents was summarized by the court in *Ray v. Cock Robin, Inc.* (1973), 10 Ill. App. 3d 276, 282, 293 N.E.2d 483, 487:

"The law is well settled that evidence of prior accidents, occurring at the same place or with the same instrumentality, is competent, not for the purpose of showing independent acts of negligence, but for the limited purposes of showing that the common cause of such accidents was the unsafe condition or thing, and that frequency of such accidents tends to show knowledge of such condition."

Evidence of dissimilar prior accidents is relevant to the issue of whether the defendant knew the accident site was generally hazardous. (*Henderson v. Illinois Central Gulf R.R. Co.* (1983), 114 Ill. App.

3d 754, 449 N.E.2d 942.) If the evidence of prior accidents is being offered only to show the defendant's notice of the generally hazardous nature of the accident site, then the proponent does not have to establish a foundation showing the similarity between the prior accidents and the present accident. (*Henderson,* 114 Ill. App. 3d at 758, 449 N.E.2d at 945, citing *First National Bank v. Illinois Central Gulf R.R. Co.* (1978), 62 Ill. App. 3d 36, 378 N.E.2d 1329.) The *Henderson* court summarized its analysis by stating:

> "[I]f the plaintiff alleges that a specific or particular danger exists, then he should be allowed to enter evidence of prior similar accidents and their detail. He should not be allowed to enter any evidence concerning dissimilar accidents." (Emphasis omitted.) ( *Henderson,* 114 Ill. App. 3d at 759, 449 N.E.2d at 945-46.)

Evidence of a prior accident may be introduced to show notice of the existence of a dangerous condition. ( *Rittenhouse v. Tabor Grain Co.* (1990), 203 Ill. App. 3d 639, 649, 561 N.E.2d 264, citing *Henderson,* 114 Ill. App. 3d at 757, 449 N.E.2d at 944. "The admissibility of such evidence is not dependent on any factual similarity between the accidents." *Rittenhouse,* 203 Ill. App. 3d at 649, citing *Henderson,* 114 Ill. App. 3d at 758, 449 N.E.2d at 945.

In *First National Bank* the plaintiff brought an action arising from a railroad crossing accident. The trial court allowed admission of evidence of five prior accidents. The railroad emphasized the fact that the plaintiff had made no attempt to lay a foundation to establish any facts surrounding the prior accidents or to show that the prior accidents were substantially similar to the case at bar. The appellate court noted that the five accidents were only used as foundation for the introduction into evidence of a petition filed by the mayor and found the petition was relevant to show notice to the railroad as it informed the company that there was concern on behalf of the town that the crossing protections in the city were inadequate. *First National Bank,* 62 Ill. App. 3d at 44-45, 378 N.E.2d at 1335-36.

In *Windeguth v. National Super Markets, Inc.* (1990), 201 Ill. App. 3d 35, 38, 558 N.E.2d 548, plaintiff slipped and fell on a grape in defendant's grocery store. Defendant argued that the trial court erred in admitting testimony of an individual that she fell on grapes in defendant's store a year and one-half before plaintiff's fall. The appellate court stated:

> "If the evidence of prior accidents is being offered only to show the defendant's notice of the generally hazardous nature of the accident site, then the proponent does not have to establish a foundation showing the similarity between the prior accidents

and the present accident. In fact, evidence of dissimilar prior accidents is relevant to the issue of whether the defendant knew the accident site was generally hazardous. [Citation.]

On the other hand, if the evidence is being offered to show the existence of a particular danger or hazard, then a foundation must be laid establishing the similarity between the prior accident and the present accident. Only similar accidents are relevant to show the existence of a particular danger. [Citation.]" (Emphasis omitted.) (*Windeguth*, 201 Ill. App. 3d at 38.)

The appellate court held that the trial court had correctly admitted the evidence to prove notice.

In *Lee v. Chicago Transit Authority* (1992), 152 Ill. 2d 432, 605 N.E.2d 493, the decedent's wife brought a wrongful death suit against the Chicago Transit Authority (CTA) to recover damages for the death of her husband, who was electrocuted by the third rail CTA tracks. The Illinois Supreme Court affirmed the trial court's decision to allow evidence of prior incidents to establish notice. Notwithstanding the CTA's offer to stipulate to the prior incidents, the court found the plaintiff was entitled to prove every element of her claim and the evidence, which was probative on the issue of notice, was properly admitted. The court found that the prior-incident evidence, which had lacked in specifics, was neither inflammatory nor unduly prejudicial. (*Lee*, 152 Ill. 2d at 465.) At trial, the plaintiff read into evidence the CTA's answers to two sets of interrogatories, wherein the CTA acknowledged injuries to persons coming into contact with a third rail at grade level. The first set of answers acknowledged six incidents which had occurred between August 1968 and May 1973 and the second set of answers acknowledged four additional incidents which occurred between July 1974 and June 1975. In addition, the plaintiff read an allegation from the complaint in the case which stated that prior to October 1977, the CTA knew, or in the exercise of reasonable care should have known, that numerous persons had suffered injuries as a result of coming into contact with the third rail; particularly knew of the incidents set forth in the answers to interrogatories from the prior cases; and that the CTA admitted knowledge of the incidents set out in the answers. Finally, the plaintiff presented the testimony of the head of the safety department for the CTA, concerning the date and place and nature of each incident from 1968 to 1973. He also confirmed that there had been three additional incidents in 1974. (*Lee*, 152 Ill. 2d at 463-64.) The supreme court noted that the evidence was presented in such a manner as to give no more than the date, place and nature of the injury and found that the evidence of prior incidents was not unfairly prejudicial to the CTA. *Lee*, 152 Ill. 2d at 464.

■ In the present case, the trial court considered the purpose for which the prior accidents were offered and decided that the only relevant point was that railway employees fell from bridges. The trial judge allowed the admission of the four prior accidents solely on the basis of notice. We find that the trial court did not abuse its discretion in allowing the admission of the prior falls on the issue of notice.

In addition, in *Lee*, the CTA argued that the plaintiff introduced evidence of previous accidents in an effort to persuade the jury that the third rail was unreasonably dangerous. The CTA claimed that when used for such a purpose, evidence of prior accidents is only admissible upon showing of substantial similarity. The CTA argued that the plaintiff failed to establish that the prior instances were substantially similar and therefore the trial court erred in allowing this evidence to reach the jury. The Illinois Supreme Court rejected this argument, noting that the trial court had limited the use of this evidence to show notice that third rail accidents were occurring and did not allow it to be used for any improper purpose. (*Lee*, 152 Ill. 2d at 457-58.) The court concluded:

"Our determination that the evidence of the prior incidents was not admitted to show that the third rail was unreasonably dangerous obviates the need for us to consider the CTA's substantial-similarity argument." *Lee*, 152 Ill. 2d at 458.

A new trial is required whenever irrelevant matter may have confused the jury or influenced their view of the relevant facts. (*Hubbard v. McDonough Power Equipment, Inc.* (1980), 83 Ill. App. 3d 272, 404 N.E.2d 311.) Defendant maintains that, here, the admission of evidence of four other accidents without any proper foundation or showing of relevancy mandates a new trial, since it is clear from closing argument that plaintiff's purpose in introducing the evidence was to use it to improperly influence the jury. Defendant argues plaintiff's attorney improperly asserted in closing argument that the railroad callously ignored the four prior falls. The relevant portion of plaintiff's closing argument is as follows:

"[Y]ou will, remember the memo from Ann Dallee, D-a-l-l-e [ *sic*] from the legal department in 1981 after the man fell off the bridge in Ottawa, Minnesota. And at that time she indicated to the other safety people in the operating department that the railroad had been cited by OSHA for failure to provide safety belts and lifelines or other safety equipment. She indicated to them that, 'We have been cited by OSHA earlier this year for a bridge over Boone, Iowa, it was Boone, Iowa, and at that time we were also cited for failure to have safety equipment.'

Now, she asked them, the safety people, if there was anything

that could be done in terms of safety to reduce the likelihood of a fall or a damage from a fall. The only thing that was done at that time was the promulgation of E51. E51 is nothing more than a general statement to the employees to, 'Hey, be careful out there. It's dangerous on a deck. Watch yourself when moving around the deck. Try to position yourself carefully when working on a deck. Be constantly vigilant while working on a deck. Exercise extreme caution when working on a deck.' And I suggest to you that that type of a rule on a procedure is willfully [ sic] inadequate. Because it does nothing more than tell the employees what they already know. That if they are not careful, they may fall.

Now, everyone who is working 31 feet in the air with an opening around you would understand that. And the railroad understands that. They understand that because everyone focuses on safety, not just on bridge work, but in all aspects of the work. What was necessary here was something beyond, 'Hey, be careful out there.' Why? Because despite this rule, which even though E51 came out in 1981, they were telling the people to be safe before that and there had been four falls from bridges in the four years prior to 1982.

\* \* \*

As proved by the history of the railroad itself they have falls despite their best intentions of safety."

The plaintiff's counsel's closing argument suggested that the prior falls should have made the defendant aware that something more was needed in terms of bridge safety than what had been provided. We believe plaintiff's closing argument adhered to the trial court's ruling that the prior falls were admissible only as to the issue of notice. As in *Lee*, the limitation of the use of the prior falls to notice obviates the need for this court to consider the defendant's claim of substantial similarity. See *Lee*, 152 Ill. 2d at 457-58.

## II

In its post-trial motion, defendant argued that it should be granted a new trial because after the trial was completed, the verdict returned, and the judgment entered, CNW learned juror Peter Jackson brought a textbook into the jury room, entitled *Introduction to Financial Management*, by Lawrence D. Schall and Charles W. Haley, which the jury then used to arrive at its verdict. The book contained various discussions of interest rates and inflation. On appeal, defendant maintains its post-trial motion seeking a new trial should have been granted.

In support of its motion for a new trial, defendant presented a handwritten unsworn statement signed by juror Peter Jackson, dated November 9, 1989, which stated:

"I was a member of the jury which heard the case of 'Templeton vs. Chicago and Northwestern Transportation.' During deliberations I brought with me a book which was being used as a textbook in a class I was taking. And this was referred to for assistance during deliberations. The title of the book was Introduction to Financial Management, Fifth Edition, by Lawrence D. Schall and Charles W. Haley. I have read the foregoing statement and find it to be true and accurate to the best of my knowledge."

In response the plaintiff presented the verified affidavits of jurors Dorothy Ross and Peter Jackson. The affidavit of Dorothy Ross stated in relevant part:

"1. I was a member of the jury in the case of *Tracy Templeton v. Chicago and Northwestern Transportation Company.*

2. I did not refer to any books during jury deliberation, nor did I observe any other jurors do so.

3. After the verdict was read by the foremen the court asked me if this was my verdict and I was unsure of what was being asked of me. The reason I was unsure was because if it had been up to me alone, I would have awarded Mr. Templeton more money, but based on the reasoning put forth by the eleven jurors, I agreed that what was read by the foreman should be our verdict. I was not pressured or coerced into rendering this verdict."

Peter Jackson's affidavit, dated December 19, 1989, stated:

"I, Peter W. Jackson, being first duly sworn on oath, depose and state that I was a member of the jury in the case of *Tracy Templeton v. Chicago and Northwestern Transportation Company.* During jury deliberations I had with me a finance textbook for a night class I was taking at the time. There came a point when one juror, Dorothy Ross, was of the opinion that the total amount of the verdict which the other jurors agreed on was not enough to take care of Mr. Templeton because inflation would reduce its value. I expressed my opinion that interest rates will rise with inflation and offset its effect to some extent. I told her that if she did not believe me, it was right there in my textbook. I reached into my bag, pulled out the book and held it up, but she did not look at it, nor do I recall any other juror looking at it. No other reference was made to this or any other book. Mrs. Ross eventually agreed to the lesser amount. There was no coercion on anyone to agree to this verdict."

The defendant cites *Haight v. Aldridge Electric Co.* (1991), 215 Ill. App. 3d 353, 575 N.E.2d 243, as additional authority for its contention that there was jury misconduct during deliberations which warrants reversal of the judgment in this case. The plaintiff maintains the *Haight* case is readily distinguishable on its facts.

The plaintiff in *Haight* was injured in an automobile accident which occurred at 8:30 p.m. A significant issue in the case was visibility and conflicting evidence had been presented as to the lighting conditions at the time of the accident. The jury returned a verdict in favor of the defendants. Attached to the plaintiff's post-trial motion was an affidavit of one of the jurors which stated that during the course of deliberations another juror had looked at an almanac which reflected that on the date of the accident sunset occurred at "six something p.m." and that the introduction of this evidence had a significant impact on the juror's deliberations in the case. (*Haight*, 215 Ill. App. 3d at 368.) The appellate court held the introduction of the almanac to be prejudicial because it was used in deciding a critical issue on which the evidence was divided. (*Haight*, 215 Ill. App. 3d at 369.) The appellate court noted that once the plaintiff established that the unauthorized information related to a critical issue in the case, the burden shifted to the defendant to demonstrate that no injury or prejudice resulted. (*Haight*, 215 Ill. App. 3d at 369.) The *Haight* court found the defendant failed to establish that there was no injury or prejudice.

Plaintiff maintains the present case is distinguishable from *Haight* and points out the only evidence CNW presented was an unsworn statement of juror Peter Jackson, whereas the plaintiff provided the sworn affidavits of Peter Jackson and Dorothy Ross. Plaintiff argues that the statement upon which the defendant relies is not under oath, not written by Mr. Jackson and is disputed by his verified affidavit. Plaintiff contends that, unlike the circumstances in *Haight*, CNW has failed to make a preliminary showing that any misconduct occurred.

Plaintiff argues the alleged error in the present case is more similar to *Waller v. Bagga* (1991), 219 Ill. App. 3d 542, 579 N.E.2d 1073, wherein the court considered juror affidavits which claimed "extraneous, prejudicial communications" took place between the bailiff and the jurors in which the bailiff allegedly made disparaging remarks about the plaintiff. (*Waller*, 219 Ill. App. 3d at 546.) The court, while noting that the comments were improper, found a reversal was not required because they did not go to a critical issue in the case. (*Waller*, 219 Ill. App. 3d at 547.) The court stated:

"Regarding whether the comments tainted the deliberative process, there is no clear evidence that the bailiff's comments ever reached all of the jurors or, if they did, formed a material part of the jury's deliberations." *Waller*, 219 Ill. App. 3d at 548.

The verified affidavits of jurors Ross and Jackson indicate that the book was never looked at or used by any juror. Although we find

the presence of the textbook in the jury room to be improper, we find the plaintiff has established that no injury or prejudice resulted. Moreover, if any error was present we find that, under the facts of the present case, any error was harmless and not reversible error.

### III

Defendant argues the damages award is inconsistent with the overwhelming evidence that plaintiff failed to mitigate his damages and, thus, the $3.5 million jury award should not be permitted to stand.

Federal law must be followed in construing plaintiff's entitlement to damages in a FELA case. (*Brown v. Chicago & North Western Transportation Co.* (1987), 162 Ill. App. 3d 926, 931-32, 516 N.E.2d 320, 325.) In *Brown,* the appellate court concluded that under applicable Federal cases an employee has the duty to mitigate damages by returning to gainful employment as soon as reasonably possible. (*Brown,* 162 Ill. App. 3d at 932, 516 N.E.2d at 325 (and cases cited therein).) The burden of proving the failure to mitigate damages rests with the defendant, in this case CNW. (*Rozny v. Marnul* (1969), 43 Ill. 2d 54, 73, 250 N.E.2d 656; see also *Amos v. Norfolk & Western Ry. Co.* (1989), 191 Ill. App. 3d 637, 641, 548 N.E.2d 96.) However, the question as to whether the plaintiff's conduct was reasonable effort under the circumstances is a question of fact. *Brown,* 162 Ill. App. 3d at 932, 516 N.E.2d at 325; *Trejo v. Denver & Rio Grande Western R.R. Co.* (10th Cir. 1977), 568 F.2d 181, 184.

In reviewing a jury's award of damages, a court has an obligation to carefully scrutinize the record to determine whether the amount of the verdict is so large as to indicate passion and prejudice. (*Brown v. Arco Petroleum Products Co.* (1989), 195 Ill. App. 3d 563, 572, 552 N.E.2d 1003, citing *Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 158 N.E.2d 63.) However, a reviewing court should not overturn a jury's verdict unless it is against the manifest weight of the evidence and a jury's verdict is not contrary to the manifest weight of the evidence when the evidence is conflicting and the jury resolved the conflict. *Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 471, 473 N.E.2d 1322, 1333.

Defendant asserts overwhelming evidence was presented that plaintiff had substantially recovered from his injuries and that his claims for future damages and loss were the result of his own continuing failure to mitigate his damages. The following are the nine points defendant makes regarding the failure to mitigate damages. We also note contradictory evidence, if any, present in the record.

1. Defendant argues that plaintiff refused to participate in a sheltered workshop program recommended by James Ragains, a rehabilitation counselor with the Institute of Physical Medicine and Rehabilitation in Peoria, Illinois, wherein plaintiff would have been placed in a sheltered workshop environment and a mock employment situation without the pressure of producing.

Mr. Ragains testified that he wanted to place the plaintiff, without pay, into the PARC program, PARC being an acronym for Peoria Association for Retarded Citizens. He described the program as "a work site with a local sheltered workshop program where they had a carpentry and word-working [sic] area for higher-functioning clients, sort of physically removed from the more severely disabled clients." Mr. Ragains did not think plaintiff had a mental handicap.

The plaintiff testified that Mr. Ragains wished to put him in a sheltered workshop program with mentally retarded persons. Mr. Ragains did not suggest to plaintiff that this was a temporary placement to get him reacclimated to working; rather, it was the plaintiff's understanding that he was being placed in the program because Mr. Raigans thought plaintiff would fit in with the mentally retarded persons. The plaintiff told Mr. Ragains that he didn't want to go into the program, he wanted to return to work. Four months after the plaintiff rejected the offer to enter the PARC program, he returned to work for the defendant. On cross-examination Mr. Raigans testified that he understood the plaintiff's reluctance to enter such a program and that it did not surprise him that the plaintiff felt that he was being classified as mentally handicapped.

2. Defendant argues that "[p]laintiff rejected an additional offer by Mr. Raigans to work in a park program in the Peoria area."

Plaintiff argues the defendant confused the word "park" with the acronym "PARC," which stands for "Peoria Association for Retarded Citizens." We agree with the plaintiff. The pages in the record the defendant cites for this proposition are part of the testimony relating to the PARC program. Although the acronym is misspelled as "PARK" in the record, it is clear the testimony refers to a single program.

3. Defendant argues that plaintiff failed to mitigate his damages when he withdrew after only eight days from a comprehensive two- to four-week vocational rehabilitation program at the vocational rehabilitation evaluation center in Des Moines, Iowa. The program had been recommended by Maxfield Potter, Jr., a vocational rehabilitation counselor for the State of Iowa, and was designed to identify Templeton's academic needs, his industrial skills, and building maintenance skills. Mr. Potter testified that almost everyone who

completed the program was helped by it and he believed that the program could have been helpful to Templeton if he had cooperated and stayed with it. Mr. Potter found that even after eight days, there was some improvement.

Mr. Potter also testified that the reason the plaintiff left the center early was due to the fact that his wife, who had been home on maternity leave, had to return to work because the family had no income. Potter testified that the plaintiff asked him to check with the railroad to see if it would pay for child care to enable him to attend the rehabilitation center; however, the railroad never offered to do so.

Mr. Potter testified that the plaintiff worked hard at the rehabilitation center, made a sincere effort, and tried his best. Mr. Potter was glad that the plaintiff was able to stay at the center as long as he did. When the plaintiff returned from the center he told Mr. Potter that his goal was to get a job and, in fact, plaintiff started applying for jobs "all over the place."

Plaintiff's wife, Verna Templeton, testified that the plaintiff originally had to wait to go to Des Moines because they did not have a babysitter. Eventually he was able to go when she was on maternity leave; however, plaintiff had to leave the program early to watch the children because she had to go back to work or the family would have had no income. Plaintiff's testimony corroborated his wife's testimony regarding the reasons he left Des Moines before the conclusion of the program.

4. Defendant argues that plaintiff failed to mitigate his damages in that he refused to seek carpentry jobs that did not require working at heights even though his own doctor had cleared him to work on ladders and refused to seek other jobs such as an auto safety glass installer recommended by Mr. Potter.

We find nothing in the record to support the allegation that the plaintiff refused to seek carpentry jobs. In January 1985 plaintiff returned to work for the defendant. Plaintiff had been back at work as a carpenter for the railroad for almost a year, when in December of 1985 his doctor cleared him to work on a ladder.

After the plaintiff was laid off work from the railroad, he immediately looked for other jobs in Iowa, but he was unable to find one. Mr. Potter testified that when the plaintiff returned from the rehabilitation center he applied for jobs at 19 locations including a lumberyard, city hall, the park district, an auto parts store, a furniture manufacturer, a meat packer, a kitchen remodeler and a temporary employment service, K mart and some motels. The plaintiff testified that he applied for jobs at "dozens" of locations. The

plaintiff ultimately obtained a job on his own at K mart, a position he subsequently left to assume the position he held at the time of trial supervising three mentally handicapped persons on work skills (at the time of trial, lawn care).

Mr. Potter testified that the people in the rehabilitation center in Des Moines sent him recommendations with respect to areas in which plaintiff might find employment. These areas were auto safety glass installer, soft tile person, and carpentry where he wouldn't be working with heights. Potter testified that he relayed these recommendations to plaintiff and that plaintiff never asked him to see if there were any possibilities of getting him into a job in those fields. However, Potter also testified that when plaintiff returned from Des Moines he actively looked for a job. In addition, there was no testimony that any jobs actually existed in any of these areas or that plaintiff turned down a job that was offered to him in any of these areas.

5. Defendant points to plaintiff's refusal to accept Mr. Potter's offer to enroll him in a training program for a recreational park career at Kirkwood Community College as a failure to mitigate damages.

Mr. Potter thought of the program as an option for plaintiff because plaintiff had applied and was rejected for another job along the same lines. Thus, Mr. Potter thought if plaintiff wanted to get training and get into this area, this program would be an avenue to do so. Potter testified that plaintiff didn't go to the program because he just didn't want to go through training. Although Mr. Potter felt that plaintiff was capable of going through training, he also testified that at the time he was impressed that plaintiff had recently been actively looking for work and that plaintiff had recently completed an evaluation in Des Moines that showed he had some capabilities.

When asked if he would want to go back to school for retraining, plaintiff testified that he did not think he could. He mentioned his memory and being sick. Dr. Morris, a neuropsychologist, believed that due to his brain damage, the plaintiff only retains about one-half of the normal amount of information presented to him, and in addition, the plaintiff has trouble concentrating, he cannot remember very well what he reads, and he "sort of gets confused when he tries to read anything for a long time."

6. Defendant argues plaintiff refused Mr. Potter's offer to enroll him in a training program in outdoor maintenance. Plaintiff argues it is clear from reading the pages defendant cites that the training program referred to is the same college program on parks referred to in number 5.

The relevant testimony on the pages defendant cites to provides:

"A. [Mr. Potter] *** Also he did have an interview with NAPA parts of Bellevue, he reported. And that's when I suggested I contact them to — OJT for the parts person job.

Q. What did he say?

A. His response was he didn't feel that that would do him any good.

* * *

Q. Did you make any other suggestions to him or recommendations?

A. Once again I—we talked about the optional training."

In the pages defendant refers to for the preceding question, Mr. Potter testified that plaintiff told him "he had put his application in for a city parks [sic] in Bellevue." The plaintiff did not get that job. Potter testified that he thought that he offered to do something on plaintiff's behalf with respect to the job, but when he looked at his notes, he did not see where he recorded that he offered to do anything as far as that particular job. However, this testimony followed:

"A.[Mr. Potter] Oh, here is a parts job, yeah, in Bellevue. he had put an application in for a parts job there.

Q. What kind of parts. What are you talking about?

A. Like—let's see. Right now I don't remember. I don't know if I got it here.

Q. Did he talk to you about this job before he made the application?

A. I think so. I think this is the job that I had offered to—call for him. ***

Q. Mr. Potter, directing your attention to the second paragraph of your office note for your visit with Mr. Templeton on March 30th, 1987, could you tell us whether or what else was discussed with Mr. Templeton on that day?

A. Okay. I talked to him about a training program at Kirkwood Community College, the parks recreation program.

* * *

Q. Did he ever go down to the Kirkwood facility to receive training in the park recreation program?

A. He did not."

It appears that the testimony on the pages defendant cites for this point refers to the same "parks" job at Bellevue as well as the same training program at Kirkwood College. Reading the testimony in context it appears that in several places the court reporter mistakeningly transcribed the word "parts" in place of the word "parks."

7. Defendant argues plaintiff failed to mitigate damages when he refused to cooperate with a psychological treatment plan especially

prepared for him by Dr. Barbara Woodward, a clinical psychologist and neuropsychologist. Dr. Woodward identified plaintiff's problem as depression and believed he has psychosomatic tendencies not related to his injury. However, Dr. Woodward believed that with appropriate medication and psychotherapy, she could have cured or reduced his depression. Dr. Woodward testified that with the plaintiff's lack of insight into his problems and the difficulty in accepting a psychological interpretation, plaintiff was "less likely than the average bear to seek treatment." She also testified that there is a difference between someone who does not comply with a doctor's advice because he or she is malingering and someone who fails to comply with said advice due to a mental condition. In Dr. Woodward's opinion, the plaintiff was not a malingerer. Dr. Greg Zoltani testified that he believed the plaintiff has a lack of insight into his problems and this lack of insight precluded plaintiff from seeking the kind of treatment he needed. Dr. Sahgal also testified that plaintiff did not have enough insight into his problems. Dr. Morris stated:

"I don't know what he could have done or could do to help himself get better. Mr. Templeton is unable to understand how [treatment] would be of help to him. *** If you cannot figure out what you should do, and you don't know what would be helpful, then I hardly see how you can be responsible for not having done that or for doing it. *** I mean, its not a choice that's open to him because he cannot reach a conclusion like that."

Further, Dr. Woodward clearly testified that plaintiff's psychosomatic tendencies were connected to his fall, stating that the head injury suffered in the fall led to "the depression which led to this neurosis or way of handling—coping with the depression."

8. Defendant argues plaintiff refused to even consider or apply for a crew caller position with the railroad that paid almost double his salary as a B&B worker at the time of the injury. A crew caller simply contacts train crews by telephone from an office and conveys their job assignments. Mr. Potter believed that Templeton could handle the job. However, Mr. Potter also stated that if he were comparing the taxidermy possibility with the crew calling position, he thought taxidermy more realistic because it was more "hands on" whereas crew calling would be more of a variable position. He reiterated that he did not think plaintiff would be successful with taxidermy as far as income.

Plaintiff, who grew up in Maquoketa, Iowa, and at the time of trial was living in Bellevue, Iowa, testified the reason he did not take the crew caller position was that it would have required moving his family to Chicago. He stated:

"I just don't want to live in a big city. I have never lived in a big city. I don't want my kids raised in a big city. It's just something totally different than what everybody [in my family] is used to." Plaintiff's wife testified that the family moved back to Iowa in January 1986 when plaintiff was laid off from the railroad. They had no family in south Pekin and since neither she nor the plaintiff was employed, they could not afford to stay. When the family moved to Iowa, plaintiff's wife got a job. When plaintiff was offered the job in west Chicago, neither she nor the plaintiff wanted to live in a big city.

9. Defendant argues that plaintiff refused to enroll in a training program in taxidermy for which CNW offered to pay and which could have enabled plaintiff to open a taxidermy business. Mr. Ragains testified that he had talked with plaintiff about the possibility of plaintiff getting schooling for taxidermy and "about the idea of his [plaintiff] opening a taxidermy business and a combined bait shop and outdoor sport equipment kind of shop." Mr. Ragains thought plaintiff was capable of doing this based on the testing he had done.

Plaintiff testified that he pursued taxidermy as a hobby but did not want to pursue it as a full-time job and he did not believe that he could make a living just doing taxidermy and that plaintiff did not know any taxidermist that made a living just doing taxidermy. Mr. Potter testified that he could understand the plaintiff's desire not to pursue taxidermy as a vocation. Mr. Potter thought taxidermy was a narrow field with a lot of competition. He did not feel that taxidermy had many alternatives as far as employment or that the plaintiff would have been successful as far as income.

■ CNW maintains it is clear plaintiff failed in his duty under FELA to mitigate his damages and the jury's verdict concluding otherwise is against the manifest weight of the evidence. Plaintiff argues that the defendant's case on mitigation was extremely weak. In commenting on the mitigation issue at the close of all the evidence the trial court stated to the defendant's counsel: "I didn't see a lot evidence to support your theory." The record reflects that conflicting evidence was presented with regard to defendant's allegations of plaintiff's failure to mitigate damages. Therefore, it was within the province of the jury to resolve the conflict. We do not find the jury's finding that the plaintiff did not fail to mitigate damages contrary to the manifest weight of the evidence.

IV

The jury returned a net verdict in favor of the plaintiff for $3,500,000. The jury made the following findings: $1,500,000 for dis-

ability; $1,899,028 for pain and suffering; $5,740 for future medical care; and $665,000 for the value of earnings lost. The jury reduced this total by 14% for the plaintiff's contributory negligence and found that plaintiff did not fail to mitigate damages. Defendant argues the $3.5 million award evinces passion and prejudice rather than reasoned judgment, particularly the $1,500,000 award for disability and disfigurement and the $1,899,028 for pain and suffering. Plaintiff maintains that the verdict was not excessive.

The amount of damages is a matter for the jury to determine. (*Baier v. Bostitch* (1993), 243 Ill. App. 3d 195, 204, 611 N.E.2d 1103.) "The test for an excessive verdict is whether it falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience." (*Ruffiner v. Material Service Corp.* (1985), 134 Ill. App. 3d 747, 759, 480 N.E.2d 1157, 1165, *rev'd on other grounds* (1987), 116 Ill. 2d 53, 506 N.E.2d 581, citing *Le Master v. Chicago Rock Island & Pacific R.R. Co.* (1976), 35 Ill. App. 3d 1001, 1030, 343 N.E.2d 65.) As was noted by the court in *Ball v. Continental Southern Lines, Inc.* (1977), 45 Ill. App. 3d 827, 360 N.E.2d 81, "[t]he determination of an adequate verdict is peculiarly within the province of the jury and great weight must be given to its determination and on the rulings of the trial court on the post-trial motion." (*Ball*, 45 Ill. App. 3d at 831, 360 N.E.2d at 84, citing *Lau v. West Towns Bus Co.* (1959), 16 Ill. App. 2d 442, 158 N.E.2d 63.) "A jury's verdict will not be determined to be excessive unless it is shown that the verdict resulted from passion or prejudice, or where the amount is so large as to shock the judicial conscience." *Baier v. Bostitch* (1993), 243 Ill. App. 3d 195, 204, 611 N.E.2d 1103, citing *American National Bank & Trust Co. v. Thompson* (1987), 158 Ill. App. 3d 478, 488, 511 N.E.2d 1206.

Defendant argues that plaintiff has essentially recovered from all his physical injuries and that plaintiff was released to return to work for the railroad and did return to work for one full year after the accident until he was laid off due to work shortages in January of 1986. Defendant argues that since January 1986 plaintiff has failed to explore job opportunities that would pay more, require less physical effort and provide greater continuity of employment than his former job.

Defendant argues the following: (1) Templeton's IQ is in the normal range; (2) he is able to continue to pursue his hobbies of hunting, fishing and taxidermy and, in fact, fishes more now than he did before the accident; (3) Templeton presently works at a lower level than his skills would dictate; (4) rehabilitation plans are available which would enhance his economic standing; (5) although

plaintiff complained of some continuing discomfort and a clicking or locking problem with his jaw, there was no evidence that the range of motion in his limbs was affected by the accident; (6) his hip fractures have healed; (7) his complaints of dizziness have gotten better since he started taking Tegretol; and (8) Templeton has no sexual dysfunction and he and his wife had another child after the accident. Defendant also argues that the evidence further established plaintiff's future medical expenses approximated only $5,740, yet the jury determined that plaintiff's pain and suffering and disability combined to exceed $3 million.

Conversely, plaintiff argues the amount of verdict was not excessive and that in so arguing the defendant chooses to ignore the voluminous damage testimony that was produced by the plaintiff through a multitude of witnesses.

Defendant has stated that the "plaintiff has essentially recovered from all his physical injuries." The cite given for this statement contains no reference to the plaintiff's physical injuries and fails to support this statement.

■ As a result of his fall, the plaintiff has suffered permanent brain damage including an epileptic disorder known as complex partial seizures, a condition which is permanent and causes dizziness and nausea. The dizziness lasts anywhere from a few seconds to a week at a time, it gets better for a while and then worsens again. The plaintiff takes Tegretal, an anti-epileptic medication. Dr. Zoltani testified plaintiff would need to take the medication for an indefinite period of time. If the plaintiff stops taking Tegretal, the dizziness gets worse and he has difficulty concentrating.

The plaintiff's brain injury has resulted in functional deficits which include: loss of memory, difficulty with attention and concentration, and difficulty with verbal communication. Dr. Morris stated that the plaintiff knows he has a problem but he is unable to comprehend what it is. These injuries are permanent.

The plaintiff suffers from post-traumatic anxiety syndrome or post-concusion syndrome. The plaintiff has somatic tendencies whereby the plaintiff believes he has physical ailments. The plaintiff also suffered severe physical injuries including fractures of his hip, pelvis, wrist and jaw as well as a severe concussion. The plaintiff underwent seven surgical procedures over the course of three years. He was treated by 41 medical specialists and at the time of trial had made over 300 doctor visits. The plaintiff sees dark lines across his vision caused by vitreous detachment with fluid floating across scar tissue. Since the date of the accident, he has suffered dizziness and nausea, as well as pain in his shoulder, knee, and neck. The plaintiff

lost seven teeth and a lot of bone from his jaw as a result of the accident. The plaintiff suffers from Temporamandibular Joint Syndrome (TMJ).

An economist testified the present cash value of the plaintiff's lost wages was $740,000. At the time of his accident, the plaintiff was 27 years old, and at the time of trial he had a life expectancy of 41 years. Testimony was presented to indicate the plaintiff's personality had changed. The jury found that the plaintiff did not fail to mitigate his damages. The plaintiff suffered numerous physical injuries and has permanent brain damage. The jury heard the testimony of numerous medical doctors. The jury saw and heard the plaintiff testify and they were in the best position to judge how his injuries have affected him. The trial judge, who heard all the evidence, refused to consider a remittitur and denied the defendant's motion for a new trial. Under the facts of this case, we must affirm the jury's verdict.

Accordingly, for all the reasons set forth above, we affirm the decision of the trial court.

Judgment affirmed.

GORDON, P.J., and COUSINS, J., concur.